**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** § | |
| § | |
| **Plaintiff**, § | |
| § | |
| **v.** § | **Case No.: 3:20-cv-822** |
| § | |
| **JEFFREY D. CORDES, WILLIAM M.** § | |
| **AISENBERG, AND THOMAS J. FELTON,** § | |
| § | |
| **Defendants.** § | |
| § | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "Plaintiff") files this Complaint against Defendants Jeffrey D. Cordes ("Cordes"), William M. Aisenberg ("Aisenberg"), and Thomas J. Felton ("Felton") (collectively, "Defendants"), and alleges as follows:

**I.**
**SUMMARY**

1.      From at least December 2015 through June 2017 (the "Relevant Period"), Defendants, the former senior management of Ironclad Performance Wear Corp. ("Ironclad"), falsely inflated Ironclad's revenues by, among other things, (i) recognizing revenue in the quarter before it was earned and (ii) recognizing revenue that was never earned because the products: (a) were never shipped to, or paid for, by a customer; (b) were exchanged for old products; (c) were cancelled or refused by customers; and/or (d) were never ordered by a customer.  The Defendants' deceptive actions inflated Ironclad's reported revenues, resulted in inaccurate books and records, and materially misstated the financial condition that Ironclad reported in its Forms 10-K, 10-Q, and 8-K filed during the Relevant Period.

## II.
## JURISDICTION AND VENUE

2.     The Commission brings this action under Section 20(b) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78u(d)], seeking to permanently restrain and enjoin the Defendants from engaging in the acts and practices alleged herein.

3.     The Court has jurisdiction over this action under Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

4.     Venue is proper because the Dallas Division of the Northern District of Texas is where Ironclad maintained its principal place of business during the Relevant Period and where a substantial part of the acts, omissions, transactions, practices, and courses of business giving rise to the claims occurred.

5.     The Defendants, directly and indirectly, made use of the mails or of the means and instrumentalities of interstate commerce in connection with the acts, omissions, transactions, practices, and courses of business described in this complaint.

6.     Defendants engaged in the acts, omissions, transactions, practices, and courses of business described in this complaint in connection with the offer, purchase, or sale of securities. During the Relevant Period, Ironclad issued stock to its employees upon the exercise of employee stock options and publicly disclosed proceeds from the issuance of that stock.

## III.
## DEFENDANTS

7.     Defendant Jeffrey D. Cordes, age 61, resides in Grand Rapids, Michigan.  He served as Ironclad's Chief Executive Officer ("CEO") from February 2014 until his resignation in July 2017.

8.      Defendant William M. Aisenberg, age 59, resides in Carrollton, Texas.  He served as Ironclad's Chief Financial Officer ("CFO") from April 2014 until his resignation in July 2017. He is a Certified Public Accountant ("CPA") licensed in New York in 1987.

9.      Defendant Thomas J. Felton, age 69, is a resident of Rowlett, Texas.  He served as Ironclad's Senior Vice President of Supply Chain from May 2014 until his termination in July 2017.  As Senior Vice President of Supply Chain, Felton reported directly to Cordes and was responsible for Ironclad's operations, including tracking and maintaining information regarding inventory and ensuring that sales transactions were completed.

**IV.**
**STATEMENT OF FACTS**

**A.      Background.**

10.      Ironclad, a Nevada corporation headquartered in Farmers Branch, Texas, was a developer and manufacturer of high-performance, task-specific gloves and apparel for use in the construction, manufacturing, oil and gas, and automotive industries.  Ironclad's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act, and was quoted on the OTCQB under the symbol "ICPW."  Ironclad owned 100 percent of the stock of Ironclad Performance Wear Corp. California ("ICPW California"), the entity through which all Ironclad-related operations were conducted.  In February 2014, Ironclad hired Cordes to serve as its CEO.  By mid-2014, Cordes brought in Aisenberg to serve as CFO and Felton to serve as Senior Vice President of Supply Chain.[1]

11.      Beginning in the fourth quarter of 2015, the Defendants orchestrated and

---

[1]      Prior to joining Ironclad, the Defendants worked together at a private company that sold sporting apparel. Cordes, Aisenberg, and Felton served as Chief Operating Officer, Chief Financial Officer, and Chief Administrative Officer, respectively.  That private company was acquired and, in August 2014, the acquiring company filed a civil lawsuit against Cordes, Aisenberg, and other associated people and entities that alleged, among other things, that they orchestrated a scheme to inflate the value of certain inventory by staging sham sales and re-purchasing the products at inflated prices.  The parties settled the case in 2015.

implemented a deceptive plan to artificially inflate Ironclad's reported revenues by recognizing (i) more than an aggregate of $3.3 million in revenue in the quarter before it was actually earned and (ii) more than an aggregate of $3 million in revenue that should never have been booked. The following chart details Ironclad's inflated revenue for each fiscal quarter and for the overall Relevant Period by dollar value and by percentage of total revenue.

| Accounting Scheme | Q4 YE 2015 | Q1 2016 | Q2 2016 | Q3 2016 | Q4 YE 2016 | Q1 2017 | Relevant Period |
|---|---|---|---|---|---|---|---|
| Recognizing revenue in the quarter before it was earned | $ 322,158 | $ 769,042 | $ 965,787 | $ 47,620 | $ 379,245 | $ 843,571 | $ 3,327,423 |
| | 4% | 15% | 18% | 1% | 5% | 19% | 9% |
| Recognizing revenue that was never earned | $ 1,560,997 | $ 264,285 | $ 310,735 | $ 63,151 | $ 841,429 | $ - | $ 3,040,597 |
| | 19% | 5% | 6% | 1% | 10% | 0% | 8% |
| Total | $ 1,883,155 | $ 1,033,327 | $ 1,276,522 | $ 110,771 | $ 1,220,674 | $ 843,571 | $ 6,368,020 |
| | 22% | 20% | 24% | 2% | 15% | 19% | 17% |

12.     During the second quarter of 2017, Ironclad received an anonymous report regarding potentially improper revenue recognition by the company.  Ironclad's audit committee engaged the company's outside counsel to review the allegations, and a committee of independent directors later retained an independent law firm to oversee an internal investigation into accounting irregularities.

13.     On July 6, 2017, Ironclad filed a current report on Form 8-K announcing that investors should no longer rely on the company's financial statements as of and for the fiscal years ended December 31, 2016 and 2015, and as of fiscal quarters ended March 31, 2017 and March 31, 2016, June 30, 2016, and September 30, 2016.  The report also announced the resignations of Cordes and Aisenberg.  Felton was terminated the following week by Ironclad's new management.

14.     On September 8, 2017, Ironclad and ICPW California filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  *See In re: ICPW Liquidation Corp., a California Corp.*, Case No. 1:17-bk-12408-MB (C.D. Cal.) jointly administered with *In re: ICPW Liquidation Corp., a Nevada Corp.*, Case No. 1:17-bk-12409-MB (C.D. Cal.).

15.     Ironclad's auditor resigned effective September 22, 2017, noting material weaknesses in Ironclad's tone at the top, entity-level controls, and revenue recognition.

16.     Ironclad and ICPW California completed a sale of substantially all of their assets on November 14, 2017.  The companies also filed a plan of liquidation, which was approved by the United States Bankruptcy Court for the Central District of California and became effective on February 28, 2018.

**B.     Through the Conduct of the Defendants, Ironclad Improperly Recognized Revenue Before it was Earned.**

17.     During the Relevant Period, Ironclad recognized more than $3.3 million in revenue for more than 50 orders that were processed on the last day or two of the quarter but were not shipped until after the quarter ended.

| Quarter | Number of Orders Booked But Not Shipped | Value of Orders Booked But Not Shipped | % of Ironclad's Quarterly Revenue |
|---------|------------------|------------------|------------------|
| 4Q 2015 | 3 | $322,158 | 4% |
| 1Q 2016 | 6 | $769,042 | 15% |
| 2Q 2016 | 10 | $965,787 | 18% |
| 3Q 2016 | 3 | $47,620 | 1% |
| 4Q 2016 | 13 | $379,245 | 5% |
| 1Q 2017 | 18 | $843,571 | 19% |
| **Total** | **53** | **$3,327,423** | **9%** |

18.     Engaging in this type of revenue recognition violates Generally Accepted Accounting Principles ("GAAP").  Under Section 605-10-25 of the FASB Accounting Standards Codification, delivery of goods is a key factor in determining whether revenue has been realized

and earned, and it is inappropriate, with limited exceptions not applicable here, to recognize revenue for products that have not yet shipped.

19. Recognizing revenue prior to shipment also conflicts with Ironclad's revenue policy as disclosed in its Forms 10-K during the Relevant Period, which stated that Ironclad "recognize[s] revenue at the time product is shipped or delivered to a customer, based on terms of agreement with a customer and collection is reasonably assured."

20. Cordes, Aisenberg, and Felton actively participated in Ironclad's practice of improperly recognizing revenue during the Relevant Period for products before they were actually shipped. Felton frequently communicated with Ironclad's third-party warehousing company about orders that were "closed in [the] system but [were] still at [the third-party warehousing company]," "posting but not shipping," or "physically staying behind." Felton approved closing orders for unshipped products, understood that his approval would trigger Ironclad to recognize revenue for those products, and knew that such revenue recognition violated relevant accounting policies and inflated Ironclad's reported revenues. In at least the fourth quarter of 2016, Aisenberg was aware that orders that were included in the reported revenues for that quarter were still in the warehouse after quarter end; he even wrote an email to Cordes noting: "[w]hy aren't these orders getting picked up, we are already at January 5th."

21. To further their deception, Aisenberg and Felton took affirmative steps to hide the unshipped orders from Ironclad's auditor by instructing the third-party warehousing company (i) to exclude certain products from the physical inventory count, and (ii) to move products "across the street" to another warehouse. In a January 2017 email, Felton wrote: "According to Bill [Aisenberg] there are three orders sitting at [the third-party warehousing company] that have to get moved today without exception. … If they don't get picked up they have to move across

the street.  They cannot be in our warehouse space when the auditors arrive!!!!"

22.      Aisenberg also reviewed documents before they were given to Ironclad's auditor

and removed certain documents (e.g., bills of lading) that showed shipments after quarter end.

**C.      Through the Conduct of Defendants, Ironclad Improperly Recognized Revenue That Ironclad Never Earned.**

23.      In addition, Ironclad booked at least another $3 million of revenue during the

Relevant Period that did not meet GAAP requirements for revenue recognition under Sections

605-10-25 and 605-15-25 of the FASB Accounting Standards Codification.

24.      Specifically, Defendants fraudulently recognized revenue for (i) products that

were never shipped to, or paid for, by the customer; (ii) exchanges that were booked as new

sales; (iii) cancelled orders; and (iv) products that were never even ordered by a customer.

*1.      Orders that Were Never Shipped to, or Paid For, By Customers.*

25.      During the Relevant Period, Ironclad booked more than $2.2 million in revenue

for sales to three customers, but the products were never shipped to, or paid for, by those

customers.  Instead, the products were returned or bought back into Ironclad's inventory and sold

to different customers without reversing the original sale.

a.      *Customer A.*

26.      During the Relevant Period, Ironclad booked revenue totaling $965,683 for three

sales to Customer A.  Customer A is a garment trader with which Cordes has a long-standing

business relationship, but, other than noted below, Customer A was not a customer of Ironclad.

27.      Each purported sale to Customer A occurred on the last business day of the

quarter.  Ironclad never shipped any orders to Customer A.  Instead, the inventory remained in

the warehouse until Ironclad re-purchased them from Customer A at an inflated price in the

following quarter and resold them to other customers.  The details of these sham transactions are summarized in the chart below.

|  | Ironclad Invoice to Customer A | % Ironclad Quarterly Sales | Customer A Invoice to Ironclad |
|---|---|---|---|
| 4Q 2015 | $413,640.00 | 5.0% | $455,004.00 |
| 2Q 2016 | $219,597.84 | 4.1% | $248,955.84 |
| 4Q 2016 | $332,445.48 | 4.1% | $339,151.20 |

28.     There was no business purpose for these transactions other than to increase Ironclad's quarterly revenue results.  In the fourth quarter of 2015 and the second quarter of 2016, Cordes and Aisenberg asked Customer A to purchase gloves and remove a brand label with the purported intent to have Customer A resell them to third parties.  But the third-party warehousing company, under Felton's management, performed the relabeling work, not Customer A.  And Customer A never made any earnest attempts to sell the gloves to third parties before Ironclad repurchased them.  In the fourth quarter of 2016, Ironclad purportedly sold the gloves to Customer A to repackage wholesale goods for resale to a retail customer.  But the work was never done, and Customer A never attempted to sell the gloves before Ironclad repurchased them.

29.     Customer A entered into each of the purchase transactions pursuant to a verbal "backstop" agreement with Cordes that guaranteed that Ironclad would repurchase any gloves Customer A did not sell for the original price, plus the cost of relabeling/repackaging, and a commission for Customer A.  Felton was aware of the backstop agreement before the sale to Customer A occurred.  Felton was also aware that Customer A did not perform any value-added services to earn a commission.

30.     Customer A never paid Ironclad for any gloves, nor did it have cash available to complete the transactions.  For the purported transactions in the fourth quarter of 2015 and the

8

second quarter of 2016, Aisenberg accounted for the transaction by issuing a check to Customer A for the difference between the repurchase price and the original sales price, and by writing off the remainder of the accounts receivable and accounts payable with a credit memo. For the purported transaction in the fourth quarter of 2016, at Aisenberg's direction, Customer A sent a wire to Ironclad for $332,151—but not until the day after Ironclad sent a wire to Customer A for $339,151. Aisenberg structured the wire payments in this manner because he feared another large credit memo write-off would cause Ironclad's bank to increase Ironclad's dilution rate and reduce its loan amount.

31.     Although Ironclad agreed to buy back the products sold to Customer A in the fourth quarter of 2015 in February 2016, Felton instructed the third party warehouse to delay bringing the products back into Ironclad's inventory until April 2016—after the close of the fiscal year.

   b.     *Customer B.*

32.     In 2015, Ironclad entered into a Canadian distribution agreement with Customer B. In the fourth quarter of 2015, despite the fact that Customer B had not paid any of its prior invoices, Ironclad offered Customer B extended payment terms for a new sale and recognized $1,289,330 in revenue. Pursuant to a December 7, 2015 letter from Cordes to Customer B, "some of the order, after billing, will be held for you in California at a separate warehouse until you can clear your Canada warehouse." In fact, gloves totaling $976,490 (11.6 percent of Ironclad's fourth quarter 2015 net sales) never left Ironclad's warehouse, and Customer B never made any payments on any invoices. In the first half of 2016, Ironclad brought back gloves from the Customer B inventory that was held in the third-party warehousing company's warehouse as needed to sell to other customers without completing any return authorizations. Felton oversaw these transactions. When it became clear that Customer B was facing bankruptcy, Ironclad

negotiated the return of the remaining Customer B inventory, and return authorizations were processed in September, October, and November 2016.

        c.    *Customer C.*

33.     In the first quarter of 2016, Ironclad recognized $264,285 in revenue for a sale to Customer C, which amounted to 5.2 percent of Ironclad's net sales for the quarter.  The terms of the transaction required payment prior to shipment, however the customer never paid the invoice and the goods were never delivered.  In an April 19, 2016 email to Cordes, Aisenberg noted that the first quarter sale may need to be reversed if payment was not received.  Instead, on June 17, 2016, Ironclad issued a return authorization for the Customer C invoice and shipped the products to a different customer without reversing the original sale in the appropriate quarter.

### 2.    *Exchanges Booked as New Sales.*

34.     In December 2016, Cordes sent a series of emails to Customer D, an Ironclad customer, asking it to exchange $100,000 of old gloves with new models.  Cordes explained that he was "trying to get the darn year done" and the deal would "help [Ironclad]."  He also explained that the deal would be "no cash" for Customer D because Ironclad "will work with you to return the same amount of product … in the first quarter of 17."  Customer D agreed to the deal, and sent Ironclad two spreadsheets – both totaling approximately $101,000 – one was labeled "EXCHANGE" and the other "GLOVES TO RETURN."  At Cordes's direction, Felton altered the spreadsheets to conceal the fact that these transaction were exchanges as opposed to new sales.  Felton deleted the word "EXCHANGE" from the first spreadsheet so that the document could be processed as a new order.  He separately modified the "GLOVES TO RETURN" spreadsheet to say "GLOVES TO RETURN Q1 2017."  Felton then forwarded the altered documents to Ironclad's customer service department to process.

35.     Cordes and Aisenberg also schemed to hide Customer D's returns from Ironclad's auditor.  When Cordes learned that the returned gloves arrived in the warehouse in early February 2017, he requested that "they sit on it a bit."  Aisenberg affirmed Cordes's request, noting: "I thought that this was not supposed to come back until after the audit."  The return authorization was not finalized until May 26, 2017.

### 3.     Cancelled Orders.

36.     Through Cordes and Aisenberg's actions and directives, Ironclad also recognized revenue for orders that customers had refused or cancelled.  For example, in the second quarter of 2016, Ironclad recognized $25,452 in revenue for a sale to Customer E despite the fact that a July 1, 2016 email to the customer service department noted: "[c]ustomer refused, he called and stated not to deliver."  Ironclad knew that the sale had been cancelled well before it closed its books for the quarter, but it made no effort to reverse the sales.  The goods were physically returned to Ironclad's warehouse on July 5, 2016, but the return authorization was delayed until the fourth quarter of 2016.

### 4.     Products That Were Never Ordered.

37.     Finally, on the last day of each fiscal year during the Relevant Period, Ironclad also recognized revenue for sales that just did not exist.

38.     On December 31, 2015, Cordes sent a series of emails to Customer F stating that Ironclad would buy back any gloves the customer could not sell, noting that "[y]ou have no risk in this matter" and "[o]ur year end desire to make numbers is your winning ticket."  Customer F rejected the offer, writing "[i]f you want to come to Houston Monday we can hash it out and backdate a po.  That is the best I can do."  Despite the fact that Ironclad never received a purchase order from Customer F, and in spite of the explicit email from that customer, Ironclad shipped the goods and recognized revenue of $170,867 for a sale to Customer F in the fourth

quarter of 2015.  On January 5, 2016, a senior accountant wrote to Aisenberg to inform him that the order "wasn't supposed to ship, although it did ship."  Ironclad re-routed the shipment so that the products never reached Customer F, but never reversed the sale.  The senior accountant also informed Aisenberg that the "same situation" occurred with at least one other customer in December 2015.

39.     In the fourth quarter of 2016, Ironclad partnered with Customer G to develop a new oil and gas glove line, and shipped the gloves from its overseas manufacturing plant to its third-party warehousing company in California where the products were held for Customer G. Despite the fact that Customer G did not submit a purchase order for, or take possession of, the gloves, Ironclad invoiced Customer G on December 31, 2016 for $163,915, and the revenue was included in Ironclad's preliminary financial statement reported on Form 8-K on March 9, 2017. In early 2017, Cordes, Aisenberg, and Felton sent numerous emails both internally and to the customer describing the "critical" and "serious" need to obtain a purchase order from Customer G.  On March 8, 2017, the day before Ironclad's Form 8-K filing, Customer G responded to Cordes noting that it expected to send over an initial purchase order the following week "for quantities not yet decided."  When no purchase order was submitted by the end of March 2017, in an effort to "not blow up an audit that has been completed [and] reported publically," Cordes repeatedly asked Customer G to confirm that it would accept Ironclad's December 2016 invoice while at the same time offering to give Customer G a "[Return Goods Authorization] to take back all of the product now – the product will never leave our warehouse!"  Ultimately, Cordes was unable to appropriately document the Customer G transaction and, at the direction of its auditor, Ironclad filed a Form 8-K/A on April 17, 2017 disclosing a decrease in previously reported revenue.

### D.   IRONCLAD'S FINANCIAL STATEMENTS WERE MATERIALLY MISLEADING

40.     As a result of the scheme, practice, and course of business described above, each financial statement filed by Ironclad on Forms 10-K, 10-Q, and 8-K during the Relevant Period contained fraudulently inflated sales and revenue numbers that were materially misleading to investors and potential investors.

41.     Cordes and Aisenberg reviewed and approved each financial statement during the Relevant Period.  Each Form 8-K and 10-Q was signed by Aisenberg, and each Form 10-K was signed and certified by Cordes and Aisenberg.

### FIRST CLAIM FOR RELIEF

**Violations of the Antifraud Provisions of the Exchange Act**
**Section 10(b) and Rules 10b-5(a) and 10b-5(c)**
**Against All Defendants**

42.     Plaintiff re-alleges and incorporates paragraphs 1 through 41 of this Complaint by reference as if set forth verbatim in this Claim.

43.     By engaging in the acts and conduct alleged herein, Defendants directly or indirectly, singly or in concert with others, in the purchase and sale of securities, by use of the means or instrumentalities of interstate commerce or by use of the mails, have (i) employed devices, schemes, and artifices to defraud, and (ii) engaged in acts, practices, and courses of business which operated as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

44.     Defendants engaged in the above-referenced conduct knowingly or with severe recklessness.

45.     By reason of the foregoing, Defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)] thereunder.

### SECOND CLAIM FOR RELIEF

**Aiding and Abetting Violations of the Antifraud Provisions of the Exchange Act
Section 10(b) and Rules 10b-5(a) and 10b-5(c)
Against Felton**

46.     Plaintiff re-alleges and incorporates paragraphs 1 through 41 of this Complaint by reference as if set forth verbatim in this Claim.

47.     By engaging in the acts and conduct alleged herein, Felton aided and abetted Cordes's and Aisenberg's violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder by knowingly or recklessly providing substantial assistance to Cordes and Aisenberg who, directly or indirectly, singly or in concert with others, in the purchase and sale of securities, by use of the means or instrumentalities of interstate commerce or by use of the mails (i) employed devices, schemes, and artifices to defraud, and (ii) engaged in acts, practices, and courses of business which operated as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

48.     By reason of the foregoing, Felton, directly or indirectly, aided and abetted and, unless enjoined, will continue to aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)] thereunder.

## THIRD CLAIM FOR RELIEF

**Violations of the Antifraud Provisions of the Securities Act**
**Securities Act Sections 17(a)(1) and 17(a)(3)**
**Against All Defendants**

49.     Plaintiff re-alleges and incorporates paragraphs 1 through 41 of this Complaint by reference as if set forth verbatim in this Claim.

50.     By engaging in the acts and conduct alleged herein, Defendants directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, have (i) employed devices, schemes, or artifices to defraud, or (ii) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon purchasers.

51.     With respect to violations of Securities Act Section 17(a)(1), Defendants engaged in the above-referenced conduct knowingly or with severe recklessness.  With respect to violations of Securities Act Section 17(a)(3), Defendants were at least negligent in the above-referenced conduct.

52.     By reason of the foregoing, Defendants have violated and, unless enjoined, will continue to violate Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of the Antifraud Provisions of the Securities Act**
**Securities Act Sections 17(a)(1) and 17(a)(3)**
**Against Felton**

53.     Plaintiff re-alleges and incorporates paragraphs 1 through 41 of this Complaint by reference as if set forth verbatim in this Claim.

54.     By engaging in the acts and conduct alleged herein, Felton aided and abetted Cordes's and Aisenberg's violations of Section1 17(a)(1) and (3) of the Securities Act by knowingly or recklessly providing substantial assistance to Cordes and Aisenberg who, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails (i) employed devices, schemes, or artifices to defraud or (ii) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon purchasers.

55.     By reason of the foregoing, Felton, directly or indirectly, aided and abetted and, unless enjoined, will continue to aid and abet violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

### FIFTH CLAIM FOR RELIEF

**Violations of the Antifraud Provisions of the Exchange Act**
**Section 10(b) and Rule 10b-5(b)**
**Against Cordes and Aisenberg**

56.     Plaintiff re-alleges and incorporates paragraphs 1 through 41 of this Complaint by reference as if set forth verbatim in this Claim.

57.     By engaging in the acts and conduct alleged herein, Defendants Cordes and Aisenberg, directly or indirectly, singly or in concert with others, in the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails, have made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58.     Defendants made the untrue and misleading statements alleged herein knowingly or with severe recklessness.

59.     By reason of the foregoing, Defendants Cordes and Aisenberg have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. §§ 240.10b-5(b)] thereunder.

### SIXTH CLAIM FOR RELEIF

**Violations of the Reporting Provisions of the Exchange Act
Aiding and Abetting Violations of Exchange Act Section 13(a) and
Rules 12b-20, 13a-1, 13a-11, and 13a-13
Against All Defendants**

60.     Plaintiff re-alleges and incorporates paragraphs 1 through 41 of this Complaint by reference as if set forth verbatim in this Claim.

61.     Ironclad's common stock was registered pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)].

62.     By engaging in the acts and conduct alleged herein, the Defendants directly or indirectly, singly or in concert with others, aided and abetted Ironclad's filing of annual, quarterly, and periodic reports required to be filed with the Commission pursuant to Section 13(a) of the Exchange Act and the rules and regulations promulgated thereunder that: (i) contained untrue statements of material fact; (ii) failed to include, in addition to the information required to be stated in such report, such further material information as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading; or (iii) failed to disclose any information required to be disclosed therein.

63.     By reason of the foregoing, Defendants have aided and abetted and, unless enjoined, will continue to aid and abet the violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## SEVENTH CLAIM FOR RELIEF

**Violations of Certification Rules of the Exchange Act
Violations of Exchange Act Rule 13a-14
Against Cordes and Aisenberg**

64.     Plaintiff re-alleges and incorporates paragraphs 1 through 41 of this Complaint by reference as if set forth verbatim in this Claim.

65.     By engaging in the acts and conduct alleged herein, Cordes and Aisenberg filed or caused to be filed annual and quarterly reports on Forms 10-K and 10-Q on behalf of Ironclad, which contained a certification required by Rule 13a-14 [17 C.F.R. § 240.13a-14] that included untrue statements of material fact, or failed to include, in addition to the information required to be stated in such certification, such further material information was necessary to make the required statements, in light of the circumstances under which they were made, not misleading, or failed to disclose any information required to be disclosed therein.

66.     By reason of the foregoing, Defendants Cordes and Aisenberg have violated and, unless enjoined, will continue to violate Rule 13a-14 [17 C.F.R. § 240.13a-14] promulgated under the Exchange Act.

## EIGHTH CLAIM FOR RELIEF

**Violations of the Books and Records Provisions of the Exchange Act
Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(A)
Against All Defendants**

67.     Plaintiff re-alleges and incorporates paragraphs 1 through 41 of this Complaint by reference as if set forth verbatim in this Claim.

68.     By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, singly or in concert with others aided and abetted Ironclad, an issuer whose securities were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], in failing to make

and keep books, records, and accounts, which, in reasonable detail, accurately and fairly

reflected the transactions and dispositions of the assets of the issuer.

69.     By reason of the foregoing, Defendants have aided and abetted and, unless

enjoined, will continue to aid and abet violations of Section 13(b)(2)(A) of the Exchange Act [15

U.S.C. § 78m(b)(2)(A)].

## NINTH CLAIM FOR RELIEF

**Misrepresentations and Misconduct in Connection with Preparation of Required Reports**
**Violations of Exchange Act Rule 13b2-2**
**Against All Defendants**

70.     Plaintiff re-alleges and incorporates paragraphs 1 through 41 of this Complaint by

reference as if set forth verbatim in this Claim.

71.     By engaging in the acts and conduct alleged herein, Defendants, officers of

Ironclad, violated Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)] by, directly or

indirectly, making, or causing to be made, materially false or misleading statements, or omitting

to state, or causing another person to omit to state, material facts necessary in order to make

statements made, in light of the circumstances under which such statements were made, not

misleading, to an accountant in connection with (i) an audit, review, or examination of the

financial statements of Ironclad, or (ii) the preparation or filing or any document or report

required to be filed with the Commission.

72.     By engaging in the acts and conduct alleged herein, Defendants, officers of

Ironclad, violated Exchange Act Rule 13b2-2(b) [17 C.F.R. § 240.13b2-2(b)] by, directly or

indirectly, taking action, or directing another to take action, to coerce, manipulate, mislead, or

fraudulently influence an independent public or certified public accountant engaged in the

performance of an audit or review of Ironclad's financial statements that are required to be filed

with the Commission while they knew or should have known that such action(s), if successful, could result in rendering Ironclad's financial statements materially misleading.

73.   By reason of the foregoing, Defendants have violated and, unless enjoined, will continue to violate Rule 13b2-2 [17 C.F.R. § 240.13b2-2] promulgated under the Exchange Act.

## TENTH CLAIM FOR RELIEF

**Violations of the Internal Controls Provisions of the Exchange Act
Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(B)
Against Cordes and Aisenberg**

74.   Plaintiff re-alleges and incorporates paragraphs 1 through 41 of this Complaint by reference as if set forth verbatim in this Claim.

75.   By engaging in the acts and conduct alleged herein, Cordes and Aisenberg, directly or indirectly, singly or in concert with others, aided and abetted Ironclad, an issuer whose securities were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] in failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; (ii) transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets; (iii) access to assets was permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

76.   By reason of the foregoing, Cordes and Aisenberg have aided and abetted and, unless enjoined, will continue to aid and abet violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## ELEVENTH CLAIM FOR RELIEF

**Circumventing or Failing to Implement Internal Controls under Exchange Act
Violations of Exchange Act Section 13(b)(5) and Rule 13b2-1
Against All Defendants**

77.     Plaintiff re-alleges and incorporates paragraphs 1 through 41 of this Complaint by reference as if set forth verbatim in this Claim.

78.     By engaging in the acts and conduct alleged herein, Defendants: (i) knowingly circumvented or knowingly failed to implement a system of internal accounting controls, or (ii) knowingly falsified, or caused to be falsified, Ironclad's books, records, and/or accounts.

79.     By reason of the foregoing, Defendants have violated and, unless enjoined, will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

### I.

Permanently enjoining Cordes from future violations of Section 17(a) of the Securities Act and Sections 10(b) and 13(b)(5) [15 U.S.C. §§ 78j(b) and 78m(b)(5)] of the Exchange Act and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, and 240.13b2-2] thereunder, and from aiding and abetting future violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

### II.

Permanently enjoining Aisenberg future violations of Section 17(a) of the Securities Act

and Sections 10(b) and 13(b)(5) [15 U.S.C. §§ 78j(b) and 78m(b)(5)] of the Exchange Act and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, and 240.13b2-2] thereunder, and from aiding and abetting future violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## III.

Permanently enjoining Felton from future violations of Sections 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)], and Sections 10(b) and 13(b)(5) [15 U.S.C. §§ 78j(b) and 78m(b)(5)] of the Exchange Act and Rules 10b-5, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2] thereunder, and from aiding and abetting future violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## IV.

Imposing a civil penalty against Cordes, Aisenberg, and Felton pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws as alleged herein;

## V.

Prohibiting Cordes, Aisenberg, and Felton from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## VI.

Imposing such other and further relief as the Commission may show itself entitled.

Dated:  April 8, 2020                              Respectfully submitted,

                                                   *Jason P. Reinsch*
                                                   Jason P. Reinsch
                                                   Texas Bar No. 24040120
                                                   United States Securities and Exchange Commission
                                                   Fort Worth Regional Office
                                                   801 Cherry Street, Suite 1900
                                                   Fort Worth, Texas 76102
                                                   (817) 900-2601 (phone)
                                                   (817) 978-4927 (facsimile)
                                                   ReinschJ@SEC.gov

                                                   ATTORNEY FOR PLAINTIFF SECURITIES
                                                   AND EXCHANGE COMMISSION