UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| VS. | ) ) | 3:20-CV-0822-G |
| THOMAS J. FELTON, | ) ) | |
| Defendant. | ) ) | |

### MEMORANDUM OPINION AND ORDER

Before the court is Thomas J. Felton ("Felton")'s motion to dismiss. Motion to Strike Immaterial Content and Dismiss Complaint and Brief in Support ("motion to dismiss") (docket entry 11). For the reasons set forth below, the motion is **GRANTED**. However, this dismissal is without prejudice and the Securities and Exchange Commission ("SEC") is granted leave to replead.

### I. BACKGROUND

#### A. Factual Background

This suit arises out of the alleged planning and execution of a scheme by Felton and other senior managers of Ironclad Performance Wear Corporation ("Ironclad") to artificially inflate Ironclad's revenues by engaging in deceptive accounting practices. Complaint (docket entry 1) ¶¶ 1, 11. Ironclad developed and manufactured "high-performance, task-specific gloves and apparel for use in the

construction, manufacturing, oil and gas, and automotive industries." *Id.* ¶ 10.

On April 8, 2020, the SEC initiated this suit against three of Ironclad's senior managers (collectively "the defendants") including Felton, Jeffrey D. Cordes ("Cordes"), and William M. Aisenberg ("Aisenberg"). *Id.* ¶¶ 7-9. During all relevant times, Cordes served as Ironclad's Chief Executive Officer; Aisenberg as Chief Financial Officer; and Felton as Senior Vice President of Supply Chain. *Id.* In his role as Senior Vice President, Felton was responsible for Ironclad's daily operations, "including tracking and maintaining information regarding inventory and ensuring that sales transactions were completed." *Id.* ¶ 9. Cordes and Aisenberg eventually consented to judgment against them, leaving Felton as the sole defendant in the case. Accordingly, some factual allegations that concern only Cordes and/or Aisenberg are omitted from this opinion.

In its complaint, the SEC alleges that between the fourth quarter of 2015 and June, 2017 (the "Relevant Period") the defendants improperly recognized more than $3.3 million in revenue before it was actually earned and more than $3 million in revenue that was never, in fact, earned. *Id.* ¶ 11. On this basis, the SEC brought eight claims against Felton. Specifically, the SEC alleged violations of Section 10(b) of the Exchange Act (count I); aiding and abetting a violation of Section 10(b) of the Exchange Act (count II); violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act (count III); aiding and abetting violations of the Securities Act (count

IV); violations and aiding and abetting violations of Section 13(a) of the Exchange Act (count VI); violations of Section 13(b)(2)(A) of the Exchange Act (count VIII); violations of Exchange Act Rule 13b2-2 (count IX); and violations of Section 13(b)(5) and Rule 13b2-1 of the Exchange Act (count XI). *Id.* ¶¶ 42-55, 60-63, 67-73, 77-79.

### 1. Revenue Improperly Recognized Before it was Earned

The SEC alleges that the defendants improperly recognized revenue during the Relevant Period for products sold but before those products were actually shipped. *Id.* ¶ 17.[1] The complaint alleges that Felton "actively participated" in this practice by frequently communicating with Ironclad's third-party warehousing company about orders that were "'closed in [the] system but [were] still at [the third-party warehousing company],' 'post[ing] but not shipping,' or 'physically staying behind.'" *Id.* ¶ 20.  Felton purportedly approved closing purchase orders for unshipped products and knew "that his approval would trigger Ironclad to recognize revenue for those products" and that such revenue "violated relevant accounting policies and inflated Ironclad's reported revenues." *Id.*

In addition to closing purchase orders for unshipped products, Felton allegedly

---

[1] This type of behavior likely violates Generally Accepted Accounting Principles.  As the complaint notes, "Section 605-10-25 of the FASB Accounting Standards Codification, delivery of goods is a key factor in determining whether revenue has been realized and earned, and it is inappropriate, with limited exceptions . . ., to recognize revenue for products that have not yet shipped." *Id.* ¶ 18.

"took affirmative steps to hide the unshipped orders from Ironclad's auditor by instructing the third-party warehousing company" to exclude certain items from the inventory count and move products to another warehouse. *Id.* ¶ 21. In the only example provided by the SEC, Felton allegedly sent an email to the third-party warehousing company in January, 2017 encouraging it to assist Ironclad in hiding unshipped products: "According to Bill [Aisenberg] there are three orders sitting at [the third-party warehousing company] that have to get moved today without exception. . . . If they don't get picked up they have to move across the street. They cannot be in our warehouse space when the auditors arrive!!!!" *Id.*

### 2. Improperly Recognized Revenue that Ironclad Never Earned.

In addition to recognizing revenue before products shipped, the SEC avers that Ironclad improperly booked at least $3 million in revenue that was never actually earned. *Id.* ¶ 23. The complaint outlines four instances in which Felton – or the defendants collectively – recognized or assisted in recognizing revenue that Ironclad never earned. As relevant to Felton, the SEC's allegations range across four of Ironclad's customers: Customers A, B, D, and G.

#### a. Customer A

The SEC asserts that Cordes and Aisenberg asked Customer A to purchase gloves, remove a brand label, and affix a new one. *Id.* ¶ 28. Customer A would then resell the rebranded gloves to third parties. *Id.* The SEC avers that Ironclad sold the

gloves to Customer A in the fourth quarter of 2016, but that "the work was never done, and Customer A never attempted to sell the gloves before Ironclad repurchased them." *Id.*  Instead, the SEC alleges, the third-party warehousing company, "under Felton's management, performed the relabeling work, not Customer A." *Id.*

Additionally, Customer A allegedly entered into this transaction on condition of a "backstop" agreement that "guaranteed that Ironclad would repurchase any gloves Customer A did not sell for the original price, plus the cost of relabeling/repackaging, and a commission for Customer A." *Id.* ¶ 29.  The SEC avers that Felton "was aware of the backstop agreement" and "also aware that Customer A did not perform any value-added services to earn a commission." *Id.*

Sometime in February, 2016, Ironclad agreed to repurchase the products sold to Customer A in the fourth quarter of 2015.  *Id.* The SEC avers that "Felton instructed the third party warehouse to delay bringing the products back into Ironclad's inventory until April 2016–after the close of the fiscal year." *Id.* ¶ 31.

### b. Customer B

Ironclad entered into a distribution agreement with Customer B in 2015. *Id.* ¶ 32.  The SEC alleges that at the end of the year, despite the fact that Customer B had not paid any invoices, Ironclad recognized $1,289,330 in revenue.  *Id.* Ironclad repurchased the gloves from Customer B sometime in early 2016 as needed to sell to other customers.  *Id.*  According to the SEC, "Felton oversaw these

transactions." *Id.*

### c. Customer D

The complaint alleges that, in 2016, Cordes sent several emails to Customer D asking it to exchange $100,000 worth of old gloves with new models. *Id.* ¶ 34. Customer D agreed and sent Ironclad two spreadsheets – one labeled "EXCHANGE" and one labeled "GLOVES TO RETURN." *Id.* The SEC posits that, at Cordes' direction, Felton altered the spreadsheets to conceal the fact that the transactions were exchanges as opposed to new sales. *Id.* Specifically, "Felton deleted the word 'EXCHANGE' from the first spreadsheet so that the document could be processed as a new order." *Id.* Felton then allegedly modified the "GLOVES TO RETURN" spreadsheet to "GLOVES TO RETURN Q1 2017" and forwarded the altered documents along for processing. *Id.*

### d. Customer G

Sometime in the fourth quarter of 2016, Ironclad contracted with Customer G to alter existing gloves into new gloves suitable for the oil and gas industry. *Id.* ¶ 39. Ironclad "shipped the [existing] gloves from its overseas manufacturing plant to its third-party warehousing company in California where the products were held for Customer G." *Id.* Although Customer G did not submit a purchase order or take possession of the gloves, Ironclad allegedly charged Customer G on December 31, 2016 for $163,915, and included the recognized revenue on Ironclad's Form 8-K

financial statement on March 9, 2017. *Id.* The SEC alleges that in early 2017, "Cordes, Aisenberg, and Felton sent numerous emails both internally and to [Customer G] describing the 'critical' and 'serious' need to obtain a purchase order from Customer G." *Id.*

On July 6, 2017, Ironclad announced that Ironclad's financial statements for the 2015, 2016, and 2017 fiscal years were not reliable. *Id.* ¶ 13. Felton was terminated by new management the following week. *Id.* Ironclad filed a voluntary bankruptcy petition on September 8, 2017. *Id.* ¶ 14. Ironclad sold substantially all of its assets and was liquidated on February 28, 2018. *Id.* ¶ 16.

### B. Procedural History

The SEC filed its complaint against Cordes, Aisenberg, and Felton on April 8, 2020. Cordes and Aisenberg were eventually dismissed from the suit, leaving Felton as the sole defendant. On June 15, 2020, Felton filed his motion to dismiss arguing, among other things, that the SEC engaged in impermissible shotgun and puzzle pleading, failed to satisfy the heightened pleading standard required by Rule 9(b), and failed to sufficiently allege materiality. The SEC filed its response on July 16, 2020. *See* Plaintiff's Response in Opposition to Defendant Thomas J. Felton's Motion to Strike Immaterial Content and Dismiss Complaint and Brief in Support ("Plaintiff's Response") (docket entry 19). Felton replied on July 30, 2020. *See* Defendant Thomas J. Felton's Reply in Support of Motion to Strike Immaterial

Content and Dismiss Complaint ("Defendant's Reply") (docket entry 21). Accordingly, Felton's motion to dismiss is ripe for decision.

## II.  ANALYSIS

### A.  Legal Standards

#### 1.  Standard for Dismissal Under Rule 12(b)(6)

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007)), *cert. denied*, 552 U.S. 1182 (2008).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S.at 555 (citations, quotation marks, and brackets omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *In re Katrina Canal*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted).  "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."  *Id*. (quoting *Martin K. Eby Construction Company, Inc. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004))

(internal quotation marks omitted).

The Supreme Court has prescribed a "two-pronged approach" to determine whether a complaint fails to state a claim under Rule 12(b)(6). See *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The court must "begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 679. The court should then assume the veracity of any well-pleaded allegations and "determine whether they plausibly give rise to an entitlement of relief." *Id*. The plausibility principle does not convert the Rule 8(a)(2) notice pleading to a "probability requirement," but "a sheer possibility that a defendant has acted unlawfully" will not defeat a motion to dismiss. *Id*. at 678. The plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (alteration in original) (quoting FED. R. CIV. P. 8(a)(2)). The court, drawing on its judicial experience and common sense, must undertake the "context-specific task" of determining whether the plaintiff's allegations "nudge" its claims against the defendants "across the line from conceivable to plausible." See *id*. at 679, 683.

2. <u>Rule 9(b) Standard</u>

A complaint need only recite a short and plain statement of the claim showing that the pleader is entitled to relief. FED. R. CIV. P. 8(a)(2). When, however, defendants are charged with fraudulent activity, the plaintiff must state with particularity the circumstances constituting fraud.[2] FED. R. CIV. P. 9(b). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The Fifth Circuit interprets Rule 9(b) strictly, requiring the plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir.), *cert. denied*, 522 U.S. 966 (1997); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001); see also *Benchmark Electronics, Inc. v. J.M. Huber Corporation*, 343 F.3d 719, 724 (5th Cir. 2003) (stating that Rule 9(b) requires the plaintiff to lay out "the who, what, when, where, and how" of the alleged fraud). If the facts pleaded in the complaint are within the opposing party's knowledge, fraud pleadings may be based on information and belief. See *Tuchman v. DSC*

---

[2] As the Fifth Circuit has noted, the purpose of the heightened pleading standard of Rule 9(b) is to provide defendants with fair notice of the plaintiff's claims, protect defendants from harm to their reputation and goodwill, reduce the number of strike suits, and prevent a plaintiff from filing baseless claims in an attempt to discover unknown wrongs. *Tuchman v. DSC Communications Corporation*, 14 F.3d 1061, 1067 (5th Cir. 1994).

*Communications Corporation*, 14 F.3d 1061, 1068 (5th Cir. 1994).

Rule 9(b) permits a plaintiff to allege generally the defendant's intent to commit fraud. FED. R. CIV. P. 9(b). ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). A mere allegation that the defendant had the requisite intent, however, will not satisfy Rule 9(b). *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994); *Tuchman*, 14 F.3d at 1068. To adequately plead fraudulent intent, the plaintiff must set forth specific facts that support an inference of fraud. *Tuchman*, 14 F.3d at 1068. The factual background adequate for an inference of fraudulent intent can be satisfied by alleging facts that show the defendant's motive.

In the event that the plaintiff fails to plead facts with sufficient particularity under Rule 9(b), dismissal of the action with prejudice is not automatic nor typically warranted. 6 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1300 (2d ed. 1990). Rather, courts usually provide an opportunity to cure the pleading "unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so." *Hart v. Bayer Corporation*, 199 F.3d 239, 247 n.6 (5th Cir. 2000); see also *Cates v. International Telephone and Telegraph Corporation*, 756 F.2d 1161, 1180 (5th Cir. 1985) ("[S]uch deficiencies do not normally justify dismissal of the suit on the merits and without leave to amend, at least not in the absence of special circumstances.").

Rather, Federal Rule of Civil Procedure 15 allows trial courts to "freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2).

### B. Application

Section 10(b) of the Exchange Act forbids (1) the "use or employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of such rules and regulations" promulgated by the Securities and Exchange Commission ("SEC"). 15 U.S.C. § 78j(b). Commission Rule 10b-5, 17 C.F.R. § 240.10b-5 (2004) ("Rule 10b-5"), prohibits, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." *Id.*; see also *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238 (5th Cir. 2009). To state a claim for securities fraud under section 10(b) of the Exchange Act and Rule 10b-5, the plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or an omission (2) of a material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused the plaintiff injury. *Lormand*, 565 F.3d at 238-39; *Rosenzweig v. Azurix Corporation*, 332 F.3d 854, 865 (5th Cir. 2003).

In its complaint, the SEC alleges five occasions in which Felton engaged in

false or misleading accounting practices.³  *See* Complaint ¶¶ 20-21 (recognizing revenue before earned); ¶¶ 28-31 (Customer A); ¶ 32 (Customer B); ¶ 34 (Customer D); ¶ 39 (Customer G).  In his motion to dismiss, Felton argues, *inter alia*, that "it is difficult, if not impossible to connect the factual allegations in the Complaint to the eight claims against Mr. Felton" because "[m]any of the allegations in the factual paragraphs concerning Mr. Felton are conclusory averments of fraud which lack sufficient factual support" as required by Rule 9(b).  Motion to Dismiss at 12.

Because the court agrees with Felton that the SEC failed to allege its facts with sufficient particularity, the court dismisses the complaint without prejudice, allowing the SEC an opportunity to replead. Accordingly, the court withholds judgment as to the remainder of Felton's arguments.  Below, the court examines the deficiencies of each factual allegation under the Rule 9(b) standard.

---

³       At times, the SEC appears to lodge factual allegations against the defendants collectively by referring to fraudulent conduct performed by "Ironclad." *See, e.g.,* Complaint ¶ 39 (". . . Ironclad partnered with Customer G [and,] [d]espite the fact that Customer G did not submit a purchase order for, or take possession of, the gloves, Ironclad invoiced Customer G on December 31, 2016 for $163,915, and the revenue was included in Ironclad's preliminary financial statement . . . ."). Such allegations against Ironclad as an entity are not referable to any particular defendant and, therefore, cannot be considered as sufficiently particular under Rule 9(b).  See *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corporation*, 125 F.3d 899, 903 (5th Cir. 1997) ("In his complaint, [the plaintiff] provided no factual basis for his belief that defendants submitted claims for medically unnecessary services other than his reference to statistical studies.  There is no indication, however, that these studies directly implicate defendants. [The plaintiff's] allegations, therefore, amount to nothing more than speculation, and thus fail to satisfy Rule 9(b).").

1. <u>Felton's Conduct in Recognizing Revenue Before it was Earned</u>

The SEC avers that, during the Relevant Period, Felton "actively participated" in improperly recognizing revenue for products sold before the products were actually shipped. Complaint ¶ 20. The complaint points to excerpts of a few undated and uncontextualized communications between Felton and the third-party warehousing company "about orders that were 'closed in [the] system but [were] still at [the] third-party warehousing company'" or that Ironclad was "posting but not shipping." *Id.* The complaint also asserts that Felton, in approving closed orders for unshipped products, "understood that his approval would trigger Ironclad to" improperly recognize revenue for these products. *Id.*

This allegation falls short of the requisite particularity required by Rule 9(b) for at least two reasons. First, the complaint gives only the most generalized time frame in which Felton allegedly made these statements. Specifically, the SEC alleges that the statements occurred over the course of "the Relevant Period," which, by definition, spans the entirety of the alleged fraud and upwards of twenty-one months between the fourth quarter of 2015 until June, 2017. See *id.* ¶ 20. The SEC asks too much of Felton and the court to tie these statements to particular instances of fraud. See *Moore v. Payson Petroleum Grayson, LLC*, 3:17-CV-1436-M, 2018 WL 793800 at *6 (N.D. Tex. Jan. 22, 2018) (holding factual allegations insufficient when alleging "only generalized time frames . . . without any specificity regarding the dates and

events"); see also *Afshar v. Norwood*, No. 3:05-CV-1625-G, 2005 WL 8153980, at *2 (N.D. Tex. Dec. 14, 2005) (Fish, Chief J.). Accordingly, the complaint's ambiguity regarding when Felton allegedly made these statements undermines an essential purpose of Rule 9(b).

Second, the complaint fails to tie these statements to the alleged fraud. One of the "central purposes" of Rule 9(b) is "to provide defendant with fair notice of [the] claim." *U.S., ex rel. Rigsby v. State Farm Fire & Casualty Company*, 794 F.3d 457, 467 (5th Cir. 2015), *aff'd*, __ U.S. __, 137 S.Ct. 436 (2016). The SEC's allegations regarding Felton's conduct in recognizing revenue before it was earned fall short of even this basic requirement. Specifically, the SEC gives no reason to believe that Felton's statements to the warehousing company furthered a fraudulent scheme except for placing the statements in the same paragraph as the alleged fraud and under the conclusory rubric that Felton "actively participated" in the practice of improperly recognizing revenue. Indeed, there may be many legitimate reasons why a product is "post[ed] but not shipp[ed]" or is "physically staying behind" after being purchased. Without spelling out the essential link between the alleged statements and fraud, the court – and likely Felton – is left to speculate on the meaning of these statements. Accordingly, this allegation fails the Rule 9(b) standard.[4]

---

[4] The court notes that Felton's alleged deception of Ironclad's auditor comes much closer to satisfying the Rule 9(b) standard. *See* Complaint ¶ 21. Standing alone, however, the allegations do not show, as the SEC claims, that Felton

### 2. Felton's Conduct Regarding Customer A

The SEC avers that Ironclad improperly recognized revenue by booking sales that were never shipped to or paid for by Customer A. *See* Complaint ¶¶ 27-31. The complaint alleges that Felton "was aware" of the backstop agreement between Ironclad and Customer A and that he was "also aware that Customer A did not perform any value-added services to earn a commission." *Id.* ¶ 29. Finally, Felton allegedly "instructed the third-party warehouse to delay bringing" certain products back to the warehouse that were re-purchased pursuant to the backstop agreement until after the close of the fiscal year. *Id.* ¶ 31.

These allegations suffer from many of the same deficiencies described above. First, the SEC fails to allege how any of Felton's actions warrant an inference of fraud. That Felton "knew" of "the backstop agreement" and "knew" Customer A did not perform any work to earn a commission does not implicate Felton in any fraudulent activity. "Mere knowledge of another's violation of § 10(b), or even aiding and abetting a violation, is not enough to establish liability under" the Exchange Act. *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp.2d 478, 495 (S.D.N.Y. 2011) (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver,*

---

recognized revenue before it was earned. Additionally, the court is wary of considering the allegations in ¶ 21 in isolation. Without the aid of other, sufficiently pleaded fraudulent conduct, the court is left "to infer a connection" between this "isolat[ed] allegation[]" and myriad claims brought against Felton. See *In re Alamosa Holdings, Inc.*, 382 F. Supp.2d 832, 857 (N.D. Tex. 2005) (Cummings, J.).

*N.A.*, 511 U.S. 164 (1994)), *aff'd*, 472 F. App'x 7 (2d Cir. 2012). What little conduct that is alleged by the SEC is largely conclusory or nonspecific. For example, the complaint asserts that "under Felton's management," the third-party warehousing company, rather than Customer A, performed the relabeling work. Such broad, conclusory allegations simply do not carry weight under Rule 9(b). See *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1019 (5th Cir. 1996) (noting that "rote conclusory allegations that the defendants 'knowingly did this' or 'recklessly did that' fail to meet the heightened pleading requirements of Rule 9(b)") (citations omitted).

Second, the SEC again provides no firm dates on which any of Felton's alleged interactions with Customer A occurred. The court and Felton are left to wonder when Felton came to know about the repurchase agreement and when Felton "instructed the third party warehouse to delay bringing the products back into Ironclad's inventory" after the close of the fiscal year. *See* Complaint ¶ 31. Accordingly, the SEC's allegations regarding Felton's conduct toward Customer A is deficient.

### 3. Felton's Conduct Regarding Customer B

The SEC avers that Felton "oversaw" fraudulent transactions between Ironclad and Customer B. *Id.* ¶ 32. These "transactions" include Ironclad's recognizing $1,289,300 in revenue from Customer B even though Customer B never paid an invoice to Ironclad. *Id.*

The assertion that Felton "oversaw" fraudulent transactions between Ironclad and Customer B is plainly inadequate under Rule 9(b). The SEC provides no details on Felton's specific activities, when they may have occurred, or how any activities are tied to fraud. In short, this assertion fails to provide the "who, what, when, where, and how" as required by Rule 9(b). See *Melder*, 27 F.3d at 1100 n.5.

#### 4. Felton's Conduct Regarding Customer D

The SEC asserts that Felton assisted Ironclad in recognizing over $100,000 in revenue from Customer D. Complaint ¶ 34. The SEC alleges that Felton altered a spreadsheet sent by Customer D, which originally reflected an exchange of old gloves for new models. *Id.* Felton allegedly "deleted the word 'EXCHANGE' from the . . . spreadsheet so that the document could be processed as a new order." *Id.* Although this allegation comes very close to satisfying the Rule 9(b) standard, it leaves out key pieces of information. Specifically, the complaint does not provide a timeframe within which the alleged alteration took place. Although the SEC maintains that the original transaction between Customer D and Ironclad occurred in December 2016, the court is left to guess when the alleged alteration occurred.

#### 5. Felton's Conduct Regarding Customer G

The complaint alleges that sometime "in the fourth quarter of 2016," Ironclad charged Customer G $163,915 for a purchase that Customer G never made. *Id.* ¶ 39. The SEC further asserts that, in early 2017, "Cordes, Aisenberg, and Felton sent

numerous emails both internally and to [Customer G] describing the 'critical' and 'serious' need to obtain a purchase order from Customer G." *Id.*

These allegations fall well short of satisfying Rule 9(b). First, the complaint fails to distill conduct by Felton as distinguished from the activities of Cordes and Aisenberg. The court does not know which emails, if any, Felton sent to Customer G. Nor can the court discern anything but the broadest generalities regarding the content of the emails. That the complaint fails to produce any specific emails or dates on which the emails were allegedly sent aggravates this problem. Second, the SEC does not tie the alleged emails by Cordes, Aisenberg, and Felton to fraudulent conduct. Even assuming that the SEC identified a particular email that Felton sent that described the "'critical' and 'serious' need to obtain a purchase order from [Customer G]," such conduct is not necessarily fraudulent and could reflect simple business realities. See *id.* Insofar as the complaint alleges fraud by Ironclad in improperly charging Customer G, the fraud as currently alleged cannot be traced to any individual defendant, much less to Felton in particular. As such, this allegation fails to satisfy the Rule 9(b) standard.

### III. CONCLUSION

Although the court recognizes that a plaintiff need not "state *all* the material facts pertinent to the case" in order to satisfy Rule 9(b), *SEC v. Sharp Capital, Inc.*, 3:98-CV-2792-G, 1999 WL 242691 at *2 (N.D. Tex. Apr. 16, 1999) (Fish, J.)

(emphasis in original), the complaint here fails to allege its facts with sufficient particularity. Accordingly, Felton's motion to dismiss is **GRANTED**. However, this dismissal is without prejudice, and the SEC is granted leave to amend its complaint to bring it into compliance, if possible, with Rule 9(b). The SEC shall have twenty-one days to file an amended complaint. If no amended complaint is filed within that time, the claims against Felton are dismissed with prejudice.

**SO ORDERED**.

December 2, 2020.

_____
A. JOE FISH
Senior United States District Judge