**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| | § | |
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| **Plaintiff**, | § | |
| | § | |
| **v.** | § | **Case No.: 3:20-cv-822** |
| | § | |
| **THOMAS J. FELTON,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

## FIRST AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "Plaintiff") files this First Amended Complaint ("Complaint") against Defendant Thomas J. Felton ("Felton"), and alleges as follows:

## I.
## SUMMARY

1.      From at least December 2015 through June 2017, Felton participated in a fraudulent scheme to falsely inflate Ironclad Performance Wear Corp.'s ("Ironclad") revenues by more than $3.3 million.  Felton manipulated the company's sales management systems and protocols and falsified client documents, which substantially assisted the scheme by making it appear to Ironclad's auditors, board of directors, and the investing public that Ironclad was earning revenue earlier than it actually was or revenue not actually earned and, in doing, so concealed the actual, dire financial condition of the company.

2.      Felton furthered this deception in three particular ways.  First, only days before the end of Ironclad's fiscal quarters spanning the fourth quarter of 2015 and the first quarter of 2017, he marked as complete, or caused his subordinates to mark as complete, in Ironclad's internal sales

and inventory database $3.3 million in customer orders.  He took these actions knowing that the customer orders would not be shipped until the following quarter.  Based on his sworn testimony, Felton understood that prematurely closing customer orders caused Ironclad to recognize revenue for those transactions, which, in these instances, was premature.  Second, Felton directed Ironclad's third-party warehouse company to relocate unshipped orders to other locations and to incorrectly calculate Ironclad's inventory, for the express purpose of concealing these goods from Ironclad's auditor, who Felton knew would question the presence of these goods in a warehouse Ironclad controlled.  These actions furthered the revenue recognition scheme by concealing from Ironclad's auditors the fact that Ironclad had not actually completed the customer transactions and, thereby, that the company was recognizing revenue prematurely.  Finally, Felton falsified customer documents to disguise product exchanges—which should not have counted as revenue-generating transactions—as new sales.  This falsely increased Ironclad's revenue.  Felton carried out this scheme along with former defendants Jeffrey D. Cordes ("Cordes") and William M. Aisenberg ("Aisenberg"), who, including Felton, comprised Ironclad's senior management team.

3.     Felton's actions caused Ironclad to artificially inflate its reported revenues, resulted in inaccurate books and records, and materially misstated the financial condition that Ironclad reported in its Forms 10-K, 10-Q, and 8-K filed between the fourth quarter of 2015 and the first quarter of 2017 (the "Relevant Period.")[1]

4.     By committing the acts alleged in this Complaint, Felton directly and indirectly engaged in, and unless restrained and enjoined by the Court will continue to engage in, acts, transactions, practices, and courses of business that violate (or aid and abet violations of) various provisions of the federal securities laws, specifically Sections 17(a)(1) and (3) of the Securities

---

[1] Ironclad used the calendar year as its fiscal year.

Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1) and (3)] and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(a), (b)(2)(A), and (b)(5)] and Rules 10b-5(a) and (c), 12b-20, 13a-1, 13a-11, 13a-13, 13b2-1, and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5(a), (c); 240.12b-20; 240.13a-1; 240.13a-11; 240.13a-13; 240.13b2-1; and 240.13b2-2.]

5.      In the interest of protecting the public from any further fraudulent activity and harm, the Commission brings this action against Felton seeking: (a) permanent injunctive relief; (b) civil penalties; and (c) all other equitable and ancillary relief to which the Court determines the Commission is entitled.

## II.
## JURISDICTION AND VENUE

6.      The Commission brings this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], seeking to permanently restrain and enjoin the Felton from engaging in the acts and practices alleged herein.

7.      The Court has jurisdiction over this action under Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8.      Venue is proper because the Dallas Division of the Northern District of Texas is where Ironclad maintained its principal place of business during the Relevant Period, where Felton resides, and where a substantial part of the acts, omissions, transactions, practices, and courses of business giving rise to the claims occurred.

9.      Felton, directly and indirectly, made use of the mails or of the means and instrumentalities of interstate commerce—such as email correspondence and phone calls with persons located in California while Felton was located in Texas—in connection with the acts,

omissions, transactions, practices, and courses of business described in this complaint.

10.     Ironclad's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act, and was quoted on the OTCQB[2] under the symbol "ICPW." During the Relevant Period, Ironclad also issued stock to its employees upon the exercise of employee stock options and publicly disclosed proceeds from the issuance of that stock. Felton's participation in the scheme to fraudulently manipulate Ironclad's revenue impacted the value of the publicly traded stock and the stock issued by Ironclad to its employees. Therefore, Felton engaged in the acts, omissions, transactions, practices, and courses of business described in this Complaint, as amended, in connection with the offer, purchase, and/or sale of securities.

## III.
## DEFENDANT

11.     Defendant Thomas J. Felton, age 69, is a resident of Rowlett, Texas. He served as Ironclad's Senior Vice President of Supply Chain from May 2014 until his termination in July 2017. As Senior Vice President of Supply Chain, Felton was responsible for, among other things, tracking and maintaining information regarding Ironclad's inventory, managing Ironclad's inventory, managing the shipment of orders, customer service, and ensuring that sales transactions were completed. Felton was the most senior operations officer at Ironclad. He reported directly to the CEO and was the third highest salaried employee at the company, behind only Cordes and Aisenberg, Ironclad's CEO and CFO, respectively.

## IV.
## RELEVANT PERSONS AND ENTITY

12.     Former defendant Jeffrey D. Cordes, age 61, resides in Grand Rapids, Michigan.

---

[2] OTCQB, also known as The Ventures Market, is an over-the-counter (or "OTC") securities market. Unlike the New York Stock Exchange or NASDAQ, it is a decentralized market for investors to purchase and sell stocks for certain registered companies, including penny stocks and shell companies.

He served as Ironclad's CEO from February 2014 until his resignation in July 2017.  On April 9, 2020, the Court entered a final judgment against Cordes in the above-captioned cause for his participation in the Ironclad revenue recognition scheme as described in the Complaint, as amended.  *See* Dkt. Nos. 1 and 8.

13.     Former defendant William M. Aisenberg, age 59, resides in Carrollton, Texas.  He served as Ironclad's CFO from April 2014 until his resignation in July 2017.  He is a Certified Public Accountant ("CPA") licensed in the State of New York in 1987.  On April 9, 2020, the Court entered a final judgment against Aisenberg in the above-captioned cause for his participation in the Ironclad revenue recognition scheme as described in the Complaint, as amended.  *See* Dkt. Nos. 1 and 9.

14.     Ironclad Performance Wear Corp. (previously defined as "Ironclad") was a Nevada corporation headquartered in Farmers Branch, Texas.  Ironclad was a developer and manufacturer of high-performance, task-specific gloves and apparel for use in the construction, manufacturing, oil and gas, and automotive industries.  Ironclad owned 100 percent of the stock of Ironclad Performance Wear Corp. California ("ICPW California"), the entity through which all Ironclad-related operations were conducted.  On September 8, 2017, Ironclad and ICPW California filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  *See In re: ICPW Liquidation Corp., a California Corp.*, Case No. 1:17-bk-12408-MB (C.D. Cal.) jointly administered with *In re: ICPW Liquidation Corp., a Nevada Corp.*, Case No. 1:17-bk-12409-MB (C.D. Cal.).  Ironclad and ICPW California completed a sale of substantially all of their assets on November 14, 2017.  The companies also filed a plan of liquidation, which was approved by the United States Bankruptcy Court for the Central District of California and became effective on February 28, 2018.

## V.
## STATEMENT OF FACTS

**A.    BACKGROUND.**

15.    During the second quarter of 2017, Ironclad received an anonymous report regarding potentially improper revenue recognition practices by the company.  Ironclad's audit committee engaged the company's outside counsel to review the allegations, and a committee of independent directors later retained an independent law firm to oversee an internal investigation into accounting irregularities.

16.    On July 6, 2017, Ironclad filed a report with the Commission on Form 8-K announcing that investors should no longer rely on the company's financial statements for the fiscal years ended December 31, 2016 and 2015, and for the fiscal quarters ended March 31, 2017 and March 31, 2016, June 30, 2016, and September 30, 2016.  The report also announced the resignations of Cordes and Aisenberg.  The following week, Ironclad's new management terminated Felton's employment.

17.    Ironclad's auditor resigned effective September 22, 2017, noting material weaknesses in Ironclad's tone at the top, entity-level controls, and revenue recognition.  In its September 22, 2017 letter to the chairman of Ironclad's audit committee, the auditor specifically noted:

> the independent counsel determined that the former Chief Executive Officer [Cordes], former Chief Financial Officer [Aisenberg] and former Head of Supply Chain [Felton], influenced and instructed employees and third parties to inappropriately record certain transactions as shipped when the goods were not shipped to a customer.

**B.    IRONCLAD IMPROPERLY RECOGNIZED REVENUE BEFORE IT WAS EARNED.**

18.    During the Relevant Period and as a result of Felton's conduct, as discussed below,

Ironclad improperly and prematurely recognized more than $3.3 million in revenue.  In total, as summarized in the following chart, Ironclad closed, invoiced, and recognized revenue for at least 53 orders that were processed on the last day or two of a quarter but were actually not shipped until after the quarter ended.

| Quarter | Number of Orders Booked But Not Shipped | Value of Orders Booked But Not Shipped | % of Ironclad's Quarterly Revenue |
|---|---|---|---|
| 4Q 2015 | 3 | $322,158 | 4% |
| 1Q 2016 | 6 | $769,042 | 15% |
| 2Q 2016 | 10 | $965,787 | 18% |
| 3Q 2016 | 3 | $47,620 | 1% |
| 4Q 2016 | 13 | $379,245 | 5% |
| 1Q 2017 | 18 | $843,571 | 19% |
| **Total** | **53** | **$3,327,423** | **9%** |

19.    By engaging in the conduct discussed below, Felton caused Ironclad to violate Generally Accepted Accounting Principles ("GAAP").  Under Section 605-10-25 of the FASB Accounting Standards Codification, delivery of goods is a key factor in determining whether revenue has been realized and earned, and it is inappropriate, with limited exceptions not applicable here, to recognize revenue for products that have not yet shipped.

20.    Recognizing revenue prior to shipment also conflicts with Ironclad's revenue policy as disclosed in its Forms 10-K during the Relevant Period, which stated that Ironclad "recognize[s] revenue at the time product is shipped or delivered to a customer, based on terms of agreement with a customer and collection is reasonably assured."

## C.    FELTON'S ROLE IN THE REVENUE RECOGNITION SCHEME.

21.    Between the fourth quarter of 2015 and the first quarter of 2017, Felton, Cordes, and Aisenberg orchestrated and implemented a scheme to artificially inflate Ironclad's reported revenues by recognizing more than $3.3 million in revenue—or 9% of Ironclad's gross revenue—

in the quarter before it was actually earned.  This scheme gave the investing public the false impression that Ironclad was performing better than it actually was, and that the company's financial condition was better than it actually was.

22.     Felton served an indispensable role in the revenue recognition scheme.  By virtue of his responsibilities as Senior Vice President of Supply Chain, Felton was able to manipulate Ironclad's shipment of products, inventory management, and intake of returned products in order to allow Ironclad to recognize revenue prematurely.  Felton also falsified customer documents, which caused Ironclad to recognize revenue that was never actually earned.[3]

### i.   *Felton Understood Ironclad's Revenue Recognition Policies.*

23.     Felton understood Ironclad's revenue recognition requirements and policies. During sworn testimony with the Commission on September 18, 2018, Felton testified that it was his responsibility as Senior Vice President of Supply Chain to "ensure that the sale transaction was completed ... in order to be able to count that sale as part of the period."  He further testified that he understood that "in order for a sales [*sic*] to be recognized in a period, it had to have been shipped or turned over to a freight carrier."  He also testified that his understanding of this revenue recognition concept came from his discussions about these policies with Aisenberg, Ironclad's former CFO and co-participant in the revenue recognition scheme.  According to his sworn testimony, he also understood that closing or posting[4] orders signaled that the particular transactions were complete and that Ironclad could recognize revenue for those transactions.

---

[3] Felton's efforts to manipulate Ironclad's internal sales and inventory tracking systems to generate false revenue were not always ultimately successful.  For example, in or about the second quarter of 2015, Felton directed a subordinate in the customer service department to knowingly ship a duplicate order to a customer.  This action would enable Ironclad to recognize two times the revenue of the legitimate single transaction.  The subordinate and their supervisor forcefully objected and did not carry out Felton's directive.

[4] As used in the Complaint, the terms "closing" or "posting" orders are synonymous.  Felton and others at Ironclad used those terms to mean that customer orders are complete and that Ironclad should book the revenue for the transactions.

24.     Felton's understanding of these revenue recognition principles is also evidenced in communications with his subordinates.  For example, in a March 31, 2017 email, he states that orders must be "turn[ed] over to [Ironclad's] forwarder and get delivery receipt to be able to count for" a quarter's sales.  In carrying out his role in the revenue recognition scheme, he intentionally disregarded these principles and directed, as discussed below, his subordinates to falsely document particular transactions so that Ironclad would recognize revenue prematurely.

### ii.   *Felton's Actions in Furtherance of the Revenue Recognition Scheme*

25.     In contravention of his understanding of proper revenue recognition practices, Felton closed—or directed his subordinates to close—customer orders prior to shipment or turn over to a freight carrier.  Notably, the prematurely closed orders always occurred only days before the end of a fiscal quarter.  In total, Felton's acts, practice, and course of conduct of prematurely closing orders resulted in Ironclad improperly recognizing approximately $3,327,423 in revenue— or approximately 9% of Ironclad's total revenue during the Relevant Period—before it was earned.

26.     Each of the individual transactions comprising this scheme—summarized in the chart in paragraph 18 above—are supported by specific evidence including invoices, which identify when Ironclad took credit for the revenue, and bills of lading, which document when Ironclad actually shipped the customer orders.  A comparison of these documents reveal that Ironclad recognized revenue for transactions in the preceding quarter when the actual shipment of the order occurred after the close of that quarter.  As a result of his actions in closing the transactions summarized in paragraph 18 that had not yet been shipped or turned over to a freight carrier, Felton improperly signaled that proceeds from these transactions could be booked by Ironclad as revenue, and, in fact, Ironclad did book the transactions as revenue.  Given his understanding that orders that had not actually shipped were not eligible to be recognized as revenue, and in his role as Senior Vice President of Supply Chain, Felton knew or was severely

reckless in not knowing that he should have delayed closing the orders—even if there were legitimate business reasons that the orders had not shipped—until after the products had actually shipped.

27.    Felton's course of conduct is evidenced in his actions and communications with regard to particular transactions.  For example, on March 31, 2016—the last day of the first quarter of 2016—a representative from Ironclad's third-party warehouse told Felton that it was impossible to get a large order shipped out before the close of the quarter.  Nonetheless, despite the fact that Ironclad would be unable to ship the order or turn it over to a freight carrier, Felton directed a representative from the warehouse to close out the order, which Felton knew or was severely reckless in not knowing would result in Ironclad to improperly recognizing this revenue in the first quarter of 2016.  Indeed, the order did not ship until the following quarter, and the order should not have closed until that time.

28.    Also, in an email dated December 30, 2016—the last day of the fourth quarter of 2016—Felton's team identified 14 separate orders totaling 29,624 gloves that would not be shipped to Ironclad's customers until *after* the close of the fourth quarter of 2016.  Despite knowing that these orders would not ship (or be turned over to a freight carrier) before the end of the quarter, Felton authorized posting the orders.  Felton knew, or was severely reckless in not knowing, that his conduct would cause the company to prematurely recognize revenue for these orders.  For orders physically remaining onsite with Ironclad he stated that they "just needed to be picked up by the respective carrier by end of the day Tuesday [January 3, 2017]" or even Wednesday, January 4, 2017—both of which were after the close of the fourth quarter of 2016.

29.    Similarly, on March 31, 2017—the last day of the first quarter of 2017—Felton ordered a member of his team to prepare a delivery receipt for a large order totaling more than

$276,000.  The delivery receipt gave the appearance that the order was complete and, thus, Ironclad could recognize that revenue.  However, Felton acknowledged in that same email that the customer would not pick up the order until the following week—after the quarter closed.  In addition to knowing that the order had not actually shipped, Felton's email communications make clear that he knew the customer was considering making changes to the order prior to pick up.  This knowledge made Felton's decision to mark the order as closed and complete even more troubling.

### iii.  *Felton Concealed the Premature Revenue Recognition from Ironclad's Auditors.*

30.     Ironclad's auditors—who were certified public accountants—might have noted that the company was improperly counting revenue for orders that had not actually shipped to customers, except that Felton took affirmative steps to conceal the unshipped orders from Ironclad's auditor.  For his part, Felton accomplished this deception by instructing Ironclad's third-party warehousing company (i) to move products "across the street" to another warehouse[5] so that the auditors would not see them, and (ii) to exclude certain products from the physical inventory count even though the inventory was actually still sitting in the warehouse.

31.     As an example, in a January 5, 2017 email, Felton wrote: "[a]ccording to Bill [Aisenberg] there are three orders sitting at [the third-party warehousing company] that have to get moved today without exception. … If they don't get picked up they have to move across the street.  They cannot be in our warehouse space when the auditors arrive!!!!" (emphasis added).  Ironclad had recognized revenue for these three orders in the prior quarter—fourth quarter of 2016—so the fact that they were still sitting in Ironclad's warehouse space almost a week after the quarter would have invited questions from Ironclad's auditors.

---

[5] Ironclad utilized a third-party warehouse in California to hold its inventory.  The warehouse had many customers in addition to Ironclad.  It had multiple warehouse buildings and dedicated space in one of its building to Ironclad's inventory.  Felton's directives to move inventory "across the street" meant the unshipped items were to be moved to another one of the warehouse's buildings away from Ironclad's dedicated space.

32.     Similarly, in a March 31, 2017 email discussing a large order that the customer was not planning to pick up until the week *after* quarter end, Felton instructed the warehouse personnel to "move it across the street or just across the aisle."

33.     In situations where orders would not actually ship to customers prior to Felton's premature closing of the orders, Felton also directed that the orders be excluded from inventory to conceal the actual disposition of the orders.  Per Felton's sworn testimony, he understood that products should not be excluded from Ironclad's inventory until they were *actually* shipped to the customer.  Therefore, his direction that products remaining in Ironclad's custody be intentionally excluded from Ironclad's inventory count was in direct violation of Ironclad's policies.  For example, in a series of emails on December 30, 2016—one day prior to the end of the first quarter of 2017—Felton's solution for untimely shipments for one large order was simply to ignore that order for purposes of Ironclad's inventory.  Felton's actions manipulated Ironclad's inventory, which, in turn, concealed Felton's deceptive conduct of prematurely closing orders so that Ironclad could prematurely recognize revenue.

### iv.  *Felton Delayed the Return of Products to Avoid Revenue Losses*

34.     In addition to improperly closing-out orders for unshipped products, Felton also delayed the intake and processing of returned products to avoid having to decrease revenue for a particular quarter.  For example, on March 30, 2016—two days before the end of the first quarter of 2016—Felton directed a representative from Ironclad's third party warehouse company not to count returned inventory valued at approximately $108,000 until after the close of the quarter. Felton knew, or was severely reckless in not knowing, that his directives were improper because he knew that this inventory had already been returned and was physically in Ironclad's possession at the third-party warehouse company.  As a result of his actions, Ironclad's revenues for the first quarter of 2016 were artificially inflated by $108,000.

**D.     FELTON MODIFIED CUSTOMER DOCUMENTS TO MAKE EXCHANGES APPEAR TO BE NEW SALES.**

35.     Not only did Felton cause Ironclad to recognize revenue prematurely, he also altered customer documents to falsely give the appearance that product exchanges were new sales. In December 2016, Cordes sent a series of emails to Customer D, an Ironclad customer, asking it to exchange $100,000 of old gloves with new models.  Cordes explained that he was "trying to get the darn year done" and the deal would "help [Ironclad]."  He also explained that the deal would be "no cash" for Customer D because Ironclad "will work with you to return the same amount of product … in the first quarter of 17."  Customer D agreed to the deal stating "we will return $100k of the Vibram glove.  My purchasing well [*sic*] send a PO for replacement gloves."

36.     On December 29, 2016, Cordes forwarded the customer's email to Felton, informing Felton that the customer was merely exchanging products and not actually placing a new order.  That same day, Customer D's purchasing department sent Ironclad an email with the subject line "Return/Exchange" attaching "2 spreadsheets with the gloves to be returned and exchanged."  Both spreadsheets totaled approximately $101,000: one was labeled "EXCHANGE" and the other "GLOVES TO RETURN."

37.     At Cordes's direction, and also on December 29, 2016, Felton altered the spreadsheets to conceal the fact that these transactions were exchanges.  First, Felton deleted the word "EXCHANGE" from the first spreadsheet so that the document would be processed as a new order.  Then, he separately modified the "GLOVES TO RETURN" spreadsheet to say "GLOVES TO RETURN Q1 2017."

38.     Felton forwarded the doctored documents to his subordinates in Ironclad's customer service department for processing at 1:08 p.m. on December 29, 2016—two days before the end of the fourth quarter of 2016.  As a result of Felton's modifications to these documents,

Ironclad recognized $101,000 from the transaction as a new sale, when it would have otherwise been an exchange that did not increase Ironclad's revenue.

## E.   IRONCLAD'S FINANCIAL STATEMENTS WERE MATERIALLY MISLEADING

39.   As a result of the scheme, practice, and course of business described above, in which Felton actively participated and substantially assisted, each financial statement filed by Ironclad on Forms 10-K, 10-Q, and 8-K[6] during the Relevant Period contained fraudulently inflated sales and revenue numbers that were materially misleading to investors and potential investors.  In short, the financial statements for these periods did not contain accurate figures for the number of sales and the amount of revenue that Ironclad made during these periods.  Moreover, as a result of the scheme, practice, and course of business described above, in which Felton actively participated and substantially assisted, Ironclad's books, records, and accounts for the Relevant Period contained falsely inflated revenue calculations.

## FIRST CLAIM FOR RELIEF

### Violations of the Antifraud Provisions of the Exchange Act
### Section 10(b) and Rules 10b-5(a) and 10b-5(c)

40.   Between the fourth quarter of 2015 and the first quarter of 2017, as described in paragraphs 1-2, 11, 17, 22-29, and 34, Felton engaged in the practice of prematurely closing, immediately prior to the end of quarters, more than 50 customer orders that he knew would not be shipped until after the quarter ended.  Based on his sworn testimony and communications with his subordinates, Felton knew that this practice deceptively inflated Ironclad's gross revenues by counting as revenue orders before they were actually shipped.  This deceptive conduct caused

---

[6] Ironclad's periodic reports on Forms 8-K that contained fraudulently inflated sales and revenue numbers that were materially misleading to investors and potential investors include include Forms 8-K dated March 19, 2016, May 12, 2016, August 11, 2016, March 9, 2017, April 17, 2017, December 31, 2016, March 24, 2017, and May 15, 2017.

Ironclad to overstate its revenue by more than $3.3 million, which is approximately 9% of Ironclad's gross revenues during this period. In addition, as described in paragraphs 1-2, 11, 22-24, and 30-34, Felton manipulated Ironclad's inventory by directing orders that had not shipped to customers be excluded from inventory and/or by relocating orders that had not shipped to customers to avoid detection by auditors. Further, as described in paragraphs 2, 11, 22-24, and 35-38, Felton manipulated customer documents in order to disguise exchanges of products as new orders, which enabled Ironclad to improperly record revenue.

41.     By engaging in the acts and conduct alleged herein, Felton directly or indirectly, singly or in concert with others, in the purchase and sale of securities, by use of the means or instrumentalities of interstate commerce or by use of the mails, (i) employed devices, schemes, and artifices to defraud, and/or (ii) engaged in acts, practices, and courses of business which operated as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

42.     Felton engaged in the above-referenced conduct knowingly or with severe recklessness. As discussed in paragraphs 2, 23, 24, and 33, above, Felton understood that Ironclad should not recognize revenue until orders were actually shipped to customers, and that closing or posting orders in Ironclad's internal database signaled that Ironclad could recognize revenue for a particular transaction.

43.     By reason of the foregoing, Felton has violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)] thereunder.

## SECOND CLAIM FOR RELIEF

**Aiding and Abetting Violations of the Antifraud Provisions of the Exchange Act
Section 10(b) and Rules 10b-5(a) and 10b-5(c)**

44.     Between the fourth quarter of 2015 and the first quarter of 2017, as described in paragraphs 1-2, 11, 17, 22-29, and 34, Felton engaged in the practice of prematurely closing, immediately prior to the end of quarters, more than 50 customer orders that he knew would not be shipped until after the quarter ended.  Based on his sworn testimony and communications with his subordinates, Felton knew that this practice deceptively inflated Ironclad's gross revenues by counting as revenue orders before they were actually shipped.  This deceptive conduct caused Ironclad to overstate its revenue by more than $3.3 million, which is approximately 9% of Ironclad's gross revenues during this period.  In addition, as described in paragraphs 1-2, 11, 22-24, and 30-34, Felton manipulated Ironclad's inventory by directing orders that had not shipped to customers be excluded from inventory and/or by relocating orders that had not shipped to customers to avoid detection by auditors.  Further, as described in paragraphs 2, 11, 22-24, and 35-38, Felton manipulated customer documents in order to disguise exchanges of products as new orders, which enabled Ironclad to improperly record revenue.

45.     By engaging in the acts and conduct alleged herein, Felton aided and abetted Cordes's and Aisenberg's violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder by knowingly or recklessly providing substantial assistance to Cordes and Aisenberg who, directly or indirectly, singly or in concert with others, in the purchase and sale of securities, by use of the means or instrumentalities of interstate commerce or by use of the mails (i) employed devices, schemes, and artifices to defraud, and/or (ii) engaged in acts, practices, and courses of business which operated as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

46.     As discussed in paragraphs 2, 23, 24, and 33, above, Felton understood that Ironclad should not recognize revenue until orders were actually shipped to customers, and that closing or posting orders in Ironclad's internal database signaled that Ironclad could recognize revenue for a particular transaction.

47.     By reason of the foregoing, Felton, directly or indirectly, aided and abetted and, unless enjoined, will continue to aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)] thereunder.

### **THIRD CLAIM FOR RELIEF**

**Violations of the Antifraud Provisions of the Securities Act
Securities Act Sections 17(a)(1) and 17(a)(3)**

48.     Between the fourth quarter of 2015 and the first quarter of 2017, as described in paragraphs 1-2, 11, 17, 22-29, and 34, Felton engaged in the practice of prematurely closing, immediately prior to the end of quarters, more than 50 customer orders that he knew would not be shipped until after the quarter ended.  Based on his sworn testimony and communications with his subordinates, Felton knew that this practice deceptively inflated Ironclad's gross revenues by counting as revenue orders before they were actually shipped.  This deceptive conduct caused Ironclad to overstate its revenue by more than $3.3 million, which is approximately 9% of Ironclad's gross revenues during this period.  In addition, as described in paragraphs 1-2, 11, 22-24, and 30-34, Felton manipulated Ironclad's inventory by directing orders that had not shipped to customers be excluded from inventory and/or by relocating orders that had not shipped to customers to avoid detection by auditors.  Further, as described in paragraphs 2, 11, 22-24, and 35-38, Felton manipulated customer documents in order to disguise exchanges of products as new orders, which enabled Ironclad to improperly record revenue.

49.     By engaging in the acts and conduct alleged herein, Felton directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, (i) employed devices, schemes, or artifices to defraud, and/or (ii) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon purchasers.

50.     With respect to violations of Securities Act Section 17(a)(1), Felton engaged in the above-referenced conduct knowingly or with severe recklessness.  With respect to violations of Securities Act Section 17(a)(3), Felton was at least negligent in the above-referenced conduct.  As discussed in paragraphs 2, 23, 24, and 33, above, Felton understood that Ironclad should not recognize revenue until orders were actually shipped to customers, and that closing or posting orders in Ironclad's internal database signaled that Ironclad could recognize revenue for a particular transaction.

51.     By reason of the foregoing, Felton has violated and, unless enjoined, will continue to violate Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of the Antifraud Provisions of the Securities Act
### Securities Act Sections 17(a)(1) and 17(a)(3)

52.     Between the fourth quarter of 2015 and the first quarter of 2017, as described in paragraphs 1-2, 11, 17, 22-29, and 34, Felton engaged in the practice of prematurely closing, immediately prior to the end of quarters, more than 50 customer orders that he knew would not be shipped until after the quarter ended.  Based on his sworn testimony and communications with his subordinates, Felton knew that this practice deceptively inflated Ironclad's gross revenues by counting as revenue orders before they were actually shipped.  This deceptive conduct caused Ironclad to overstate its revenue by more than $3.3 million, which is approximately 9% of

Ironclad's gross revenues during this period.  In addition, as described in paragraphs 1-2, 11, 22-24, and 30-34, Felton manipulated Ironclad's inventory by directing orders that had not shipped to customers be excluded from inventory and/or by relocating orders that had not shipped to customers to avoid detection by auditors.  Further, as described in paragraphs 2, 11, 22-24, and 35-38, Felton manipulated customer documents in order to disguise exchanges of products as new orders, which enabled Ironclad to improperly record revenue.

53.     By engaging in the acts and conduct alleged herein, Felton aided and abetted Cordes's and Aisenberg's violations of Section 17(a)(1) and (3) of the Securities Act by knowingly or recklessly providing substantial assistance to Cordes and Aisenberg who, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails (i) employed devices, schemes, or artifices to defraud, and/or (ii) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon purchasers.

54.     By reason of the foregoing, Felton, directly or indirectly, aided and abetted and, unless enjoined, will continue to aid and abet violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

### FIFTH CLAIM FOR RELIEF

**Violations of the Reporting Provisions of the Exchange Act
Aiding and Abetting Violations of Exchange Act Section 13(a) and
Rules 12b-20, 13a-1, 13a-11, and 13a-13**

55.     Ironclad's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)].  Therefore, pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], Ironclad was obligated to file various reports with the Commission, including quarterly reports on Form 10-Q, annual reports on Form 10-K, and

periodic reports on Form 8-K.  Ironclad, in fact, filed Forms 10-K for the fiscal years ended December 31, 2016 and 2015, and Forms 10-Q for the fiscal quarters ended March 31, 2017 and March 31, 2016, June 30, 2016, and September 30, 2016 and various Forms 8-K identified in paragraph 39 and footnote 6.  The financial reports and information contained in these Forms 10-K, 10-Q, and 8-K, however, contained untrue statements of material fact as a result of Felton's actions.

56.     Specifically, between the fourth quarter of 2015 and the first quarter of 2017, as described in paragraphs 1-2, 11, 17, 22-29, and 34, Felton engaged in the practice of prematurely closing, immediately prior to the end of quarters, more than 50 customer orders that he knew would not be shipped until after the quarter ended.  Based on his sworn testimony and communications with his subordinates, Felton knew that this practice deceptively inflated Ironclad's gross revenues by counting as revenue orders before they were actually shipped.  This deceptive conduct caused Ironclad to overstate its revenue by more than $3.3 million, which is approximately 9% of Ironclad's gross revenues during this period.  In addition, as described in paragraphs 1-2, 11, 22-24, and 30-34, Felton manipulated Ironclad's inventory by directing orders that had not shipped to customers be excluded from inventory and/or by relocating orders that had not shipped to customers to avoid detection by auditors.  Further, as described in paragraphs 2, 11, 22-24, and 35-38, Felton manipulated customer documents in order to disguise exchanges of products as new orders, which enabled Ironclad to improperly record revenue.

57.     By engaging in the acts and conduct alleged herein, Felton directly or indirectly, singly or in concert with others, aided and abetted Ironclad's filing of annual, quarterly, and periodic reports required to be filed with the Commission pursuant to Section 13(a) of the Exchange Act and the rules and regulations promulgated thereunder that: (i) contained untrue

statements of material fact; (ii) failed to include, in addition to the information required to be stated in such report, such further material information as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading; or (iii) failed to disclose any information required to be disclosed therein.

58.     By reason of the foregoing, Felton has aided and abetted and, unless enjoined, will continue to aid and abet the violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## SIXTH CLAIM FOR RELIEF

**Violations of the Books and Records Provisions of the Exchange Act
Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(A)**

59.     Between the fourth quarter of 2015 and the first quarter of 2017, as described in paragraphs 1-2, 11, 17, 22-29, and 34, Felton engaged in the practice of prematurely closing, immediately prior to the end of quarters, more than 50 customer orders that he knew would not be shipped until after the quarter ended.  Based on his sworn testimony and communications with his subordinates, Felton knew that this practice deceptively inflated Ironclad's gross revenues by counting as revenue orders before they were actually shipped.  This deceptive conduct caused Ironclad to overstate its revenue by more than $3.3 million, which is approximately 9% of Ironclad's gross revenues during this period.  In addition, as described in paragraphs 1-2, 11, 22-24, and 30-34, Felton manipulated Ironclad's inventory by directing orders that had not shipped to customers be excluded from inventory and/or by relocating orders that had not shipped to customers to avoid detection by auditors.  Further, as described in paragraphs 2, 11, 22-24, and 35-38, Felton manipulated customer documents in order to disguise exchanges of products as new orders, which enabled Ironclad to improperly record revenue.

60.     By engaging in the acts and conduct alleged herein, Felton, directly or indirectly, singly or in concert with others, aided and abetted Ironclad, an issuer whose securities were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], in failing to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of the issuer.  More specifically, as a result of Felton's actions, Ironclad's books, records, and accounts contained falsely inflated revenue calculations.

61.     By reason of the foregoing, Felton has aided and abetted and, unless enjoined, will continue to aid and abet violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## SEVENTH CLAIM FOR RELIEF

**Misrepresentations and Misconduct in Connection with Preparation of Required Reports
Violations of Exchange Act Rule 13b2-2**

62.     Between the fourth quarter of 2015 and the first quarter of 2017, as described in paragraphs 1-2, 11, 17, 22-29, and 34, Felton engaged in the practice of prematurely closing, immediately prior to the end of quarters, more than 50 customer orders that he knew would not be shipped until after the quarter ended.  Based on his sworn testimony and communications with his subordinates, Felton knew that this practice deceptively inflated Ironclad's gross revenues by counting as revenue orders before they were actually shipped.  This deceptive conduct caused Ironclad to overstate its revenue by more than $3.3 million, which is approximately 9% of Ironclad's gross revenues during this period.  In addition, as described in paragraphs 1-2, 11, 22-24, and 30-34, Felton manipulated Ironclad's inventory by directing orders that had not shipped to customers be excluded from inventory and/or by relocating orders that had not shipped to customers to avoid detection by auditors.  Further, as described in paragraphs 2, 11, 22-24, and

35-38, Felton manipulated customer documents in order to disguise exchanges of products as new orders, which enabled Ironclad to improperly record revenue.

63.     By engaging in the acts and conduct alleged herein, Felton, an officer of Ironclad, violated Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)] by, directly or indirectly, making, or causing to be made, materially false or misleading statements, or omitting to state, or causing another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with (i) an audit, review, or examination of the financial statements of Ironclad, and/or (ii) the preparation or filing or any document or report required to be filed with the Commission.

64.     By engaging in the acts and conduct alleged herein, Felton, an officer of Ironclad, violated Exchange Act Rule 13b2-2(b) [17 C.F.R. § 240.13b2-2(b)] by, directly or indirectly, taking action, or directing another to take action, to coerce, manipulate, mislead, or fraudulently influence an independent public or certified public accountant engaged in the performance of an audit or review of Ironclad's financial statements that are required to be filed with the Commission while they knew or should have known that such action(s), if successful, could result in rendering Ironclad's financial statements materially misleading.

65.     By reason of the foregoing, Felton has violated and, unless enjoined, will continue to violate Rule 13b2-2 [17 C.F.R. § 240.13b2-2] promulgated under the Exchange Act.

## EIGHTH CLAIM FOR RELIEF

**Circumventing or Failing to Implement Internal Controls under Exchange Act
Violations of Exchange Act Section 13(b)(5) and Rule 13b2-1**

66.     Between the fourth quarter of 2015 and the first quarter of 2017, as described in paragraphs 1-2, 11, 17, 22-29, and 34, Felton engaged in the practice of prematurely closing,

immediately prior to the end of quarters, more than 50 customer orders that he knew would not be shipped until after the quarter ended.  Based on his sworn testimony and communications with his subordinates, Felton knew that this practice deceptively inflated Ironclad's gross revenues by counting as revenue orders before they were actually shipped.  This deceptive conduct caused Ironclad to overstate its revenue by more than $3.3 million, which is approximately 9% of Ironclad's gross revenues during this period.  In addition, as described in paragraphs 1-2, 11, 22-24, and 30-34, Felton manipulated Ironclad's inventory by directing orders that had not shipped to customers be excluded from inventory and/or by relocating orders that had not shipped to customers to avoid detection by auditors.  Further, as described in paragraphs 2, 11, 22-24, and 35-38, Felton manipulated customer documents in order to disguise exchanges of products as new orders, which enabled Ironclad to improperly record revenue.

67.    By engaging in the acts and conduct alleged herein, Felton: (i) knowingly circumvented or knowingly failed to implement a system of internal accounting controls, and/or (ii) knowingly falsified, or caused to be falsified, Ironclad's books, records, and/or accounts.  More specifically, as a result of Felton's actions, Ironclad's books, records, and accounts contained falsely inflated revenue calculations.  As discussed in paragraphs 2, 23, 24, and 33, above, Felton understood that Ironclad should not recognize revenue until orders were actually shipped to customers, and that closing or posting orders in Ironclad's internal database signaled that Ironclad could recognize revenue for a particular transaction.

68.    By reason of the foregoing, Felton has violated and, unless enjoined, will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

### I.

Permanently enjoining Felton from future violations of Sections 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)], and Sections 10(b) and 13(b)(5) [15 U.S.C. §§ 78j(b) and 78m(b)(5)] of the Exchange Act and Rules 10b-5, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2] thereunder, and from aiding and abetting future violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

### IV.

Imposing a civil penalty against Felton pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws as alleged herein.

### V.

Prohibiting Felton from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

### VI.

Imposing such other and further relief as the Commission may show itself entitled.

Dated:  January 7, 2021                          Respectfully submitted,

                                                 *Jason P. Reinsch*
                                                 Jason P. Reinsch
                                                 Texas Bar No. 24040120
                                                 United States Securities and Exchange Commission
                                                 Fort Worth Regional Office
                                                 801 Cherry Street, Suite 1900
                                                 Fort Worth, Texas 76102
                                                 (817) 900-2601 (phone)
                                                 (817) 978-4927 (facsimile)
                                                 ReinschJ@SEC.gov

                                                 ATTORNEY FOR PLAINTIFF SECURITIES
                                                 AND EXCHANGE COMMISSION