UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | ) | |
| COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | |
| VS. | ) | 3:20-CV-0822-G |
| | ) | |
| THOMAS J. FELTON, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Before the court is Thomas J. Felton ("Felton")'s motion to dismiss.  Motion to Dismiss First Amended Complaint and Brief in Support ("motion to dismiss") (docket entry 27).  For the reasons set forth below, the motion is **GRANTED** in part and **DENIED** in part.

### I.  BACKGROUND

#### A.  Factual Background

This suit arises out of Felton's alleged participation in a fraudulent scheme to artificially inflate Ironclad Performance Wear Corporation ("Ironclad")'s revenues by more than $3.3 million.  First Amended Complaint ("Amended Complaint") (docket entry 26) ¶ 1.  Ironclad was a Nevada corporation headquartered in Farmers Branch, Texas, that developed and manufactured "high-performance, task-specific gloves and apparel for use in the construction, manufacturing, oil and gas, and automotive

industries." *Id.* ¶ 14.

Ironclad's common stock was traded on the OTCQB[1] under the symbol "ICPW." *Id.* ¶ 10.  Between the fourth quarter of 2015 and the first quarter of 2017 ("the Relevant Period"), "Ironclad also issued stock to its employees upon the exercise of employee stock options and publicly disclosed proceeds from the issuance of that stock." *Id.*

The plaintiff Securities and Exchange Commission ("SEC") alleges that "[d]uring the second quarter of 2017, Ironclad received an anonymous report regarding potentially improper revenue recognition practices by the company." *Id.* ¶ 15.  On July 6, 2017, after an independent investigation into "accounting irregularities," Ironclad filed a report with the SEC "announcing that investors should no longer rely on the company's financial statements" over the last several quarters. *Id.* ¶¶ 15-16.  Ironclad's auditor resigned on September 22, 2017, noting specifically in a letter to the chairman of Ironclad's audit committee that Ironclad leadership "influenced and instructed employees and third parties to inappropriately record certain transactions as shipped when the goods were not shipped to a customer." *Id.* ¶ 17.  The SEC asserts that, in total, "Ironclad closed, invoiced, and recognized revenue for at least 53 orders that were processed on the last day or two of a quarter

---

[1]     OTCQB is an over-the-counter securities market in which investors purchase and sell stocks for registered companies, including penny stocks and shell companies.

but were not actually shipped until after the quarter ended." *Id.* ¶ 18. The SEC avers that this practice – resulting in prematurely recognizing over $3.3 million in revenue – violates Generally Accepted Accounting Principles ("GAAP") and Ironclad's own revenue recognition policy. *Id.* ¶¶ 18-20.

As a result of the discovery of its artificially inflated revenue, Ironclad entered Chapter 11 bankruptcy on September 8, 2017. *Id.* ¶ 14. Ironclad liquidated substantially all of its assets on November 14, 2017.[2]

The SEC alleges that "Felton carried out this scheme along with former defendants Jeffrey D. Cordes ('Cordes') and William M. Aisenberg ('Aisenberg'), who, including Felton, comprised Ironclad's senior management team." *Id.* ¶ 2. During all relevant times, Cordes served as Ironclad's Chief Executive Officer; Aisenberg as Chief Financial Officer; and Felton as Senior Vice President of Supply Chain. Complaint ("Original Complaint") (docket entry 1) ¶¶ 7-9. In his role as Senior Vice President, Felton was responsible for Ironclad's daily operations, including "tracking and maintaining information regarding Ironclad's inventory, managing Ironclad's inventory, managing the shipment of orders, customer service, and ensuring that sales transactions were completed." Amended Complaint ¶ 11.

---

[2]      Ironclad owned "100 percent of the stock of Ironclad Performance Wear Corp. California ("ICPW California"), the entity through which all Ironclad-related operations were conducted." *Id.* The distinction between these two corporate entities is irrelevant to this opinion unless otherwise noted.

Cordes and Aisenberg consented to judgment against them, leaving Felton as the sole defendant in this case.

In its Amended Complaint, the SEC alleges that, during the Relevant Period, Felton engaged in the fraudulent scheme to artificially increase Ironclad's revenue in three ways, which are set forth in greater detail below.  *Id.* ¶ 2.  First, "he marked as complete, or caused his subordinates to mark as complete, in Ironclad's internal sales and inventory database $3.3 million in customer orders" despite "knowing that the customer orders would not be shipped until the following quarter."  *Id.*  Second, "Felton directed Ironclad's third-party warehouse company to relocate [the completed but] unshipped orders to other locations and to incorrectly calculate Ironclad's inventory, for the express purpose of concealing these goods from Ironclad's auditor, who Felton knew would question the presence of these goods in a warehouse Ironclad controlled."  *Id.*  The SEC asserts that this functioned to conceal the completed but unshipped orders and the premature revenue recognized therefrom.  Finally, the SEC alleges that "Felton falsified customer documents to disguise product exchanges – which should not have counted as revenue-generating transactions – as new sales," further inflating Ironclad's revenue.  *Id.*  Aside from artificially inflating Ironclad's revenue, the SEC also asserts that Felton's actions contributed to materially misleading financial statements produced and disseminated by Ironclad.

On these bases, the SEC brings eight claims against Felton.  Specifically, the SEC alleges violations of Section 10(b) of the Exchange Act (count I); aiding and abetting violations of Section 10(b) of the Exchange Act (count II); violations of sections 17(a)(1) and 17(a)(3) of the Securities Act (count III); aiding and abetting violations of sections 17(a)(1) and 17(a)(3) of the Securities Act (count IV); violations and aiding and abetting violations of section 13(a) of the Exchange Act (count V); violations of the books and records provisions of the Exchange Act and aiding and abetting violations of section 13(b)(2)(A) of the Exchange Act (count VI); misrepresentations and misconduct regarding the preparation of required reports under the Exchange Act (count VII); and circumventing or failing to implement internal controls under section 13(b)(5) of the Exchange Act (count VIII).  *Id.* ¶¶ 40-68.

### 1. Revenue Improperly Recognized Before it was Earned

The SEC alleges that Felton improperly closed fifty-three orders between the fourth quarter of 2015 and the first quarter of 2017, representing $3.3 million in revenue.  According to the SEC, "[e]ach of the [fifty-three] individual transactions comprising this scheme . . . are supported by specific evidence including invoices, which identify when Ironclad took credit for the revenue, and bills of lading, which document when Ironclad actually shipped the customer orders" and that comparing "these documents reveal[s] that Ironclad recognized revenue for transactions in the

preceding quarter when the actual shipment of the order occurred after the close of that quarter." *Id.* ¶ 26.  Significantly, the SEC asserts that "the prematurely closed orders always occurred only days before the end of a fiscal quarter." *Id.* ¶ 25.

The SEC contends that Felton furthered the fraudulent scheme by "improperly signal[ing] that proceeds from these transactions could be booked by Ironclad as revenue, and, in fact, Ironclad did book the transactions as revenue." *Id.* ¶ 26. Although the SEC does not paint an exhaustive portrait of Felton's activities in this regard over the nearly two-year scheme, the Amended Complaint provides three purportedly representative vignettes of Felton's conduct in prematurely recognizing revenue.  "For example, on March 31, 2016 – the last day of the first quarter of 2016 – a representative from Ironclad's third-party warehouse told Felton that it was impossible to get a large order shipped out before the close of the quarter. Nonetheless, despite the fact that Ironclad would be unable to ship the order . . ., Felton directed a representative from the warehouse to close out the order . . . ." *Id.* ¶ 27.  Similarly, "in an email dated December 30, 2016 – the last day of the fourth quarter of 2016 – Felton's team identified 14 separate orders totaling 29,624 gloves that would not be shipped to Ironclad's customers until *after* the close of the fourth quarter of 2016.  Despite knowing that these orders would not ship . . . before the end of the quarter, Felton authorized posting the orders." *Id.* ¶ 28.  The SEC urges that Felton acknowledged in this email that "orders physically remaining

- 6 -

onsite with Ironclad . . . 'just needed to be picked up by the representative carrier by the end of Tuesday'" or Wednesday, both of which were after the close of the quarter.  *Id.*  Finally, the SEC points to an email sent by Felton on March 31, 2017 (the last day of the first quarter of 2017), ordering "a member of his team to prepare a delivery receipt for a large order totaling more than $276,000."  *Id.* ¶ 29.  Although the receipt "gave the appearance that the order was complete," "Felton acknowledged in the same email that the customer would not pick up the order until the following week – after the quarter closed."  *Id.*

The SEC asserts that Felton also "delayed the intake and processing of returned products to avoid having to decrease revenue for a particular quarter."  *Id.* ¶ 34.  On March 30, 2016, Felton allegedly "directed a representative from Ironclad's third party warehouse company not to count returned inventory valued at approximately $108,000 until after the close of the quarter."  *Id.*  The result, according to the SEC, was to artificially increase Ironclad's revenue by $108,000 for the first quarter of 2016.

The SEC also maintains that Felton understood the nature of his conduct.  In particular, "[d]uring sworn testimony with [the SEC] on September 18, 2018, Felton testified that it was his responsibility as Senior Vice President of Supply Chain to 'ensure the sale transaction was completed . . . in order to be able to count that sale as part of the period.'"  *Id.* ¶ 23 (ellipses in original).  In that same testimony, Felton

testified that "he understood that 'in order for a sales [*sic*] to be recognized in a period, it had to have been shipped or turned over to a freight carrier'" and that "closing or posting orders signaled that the particular transactions were complete and that Ironclad could recognize revenue for those transactions." *Id.*

2. Concealment of Prematurely Recognized Revenue from Ironclad's Auditors

The SEC asserts that Felton improperly circumvented review by auditors "by instructing Ironclad's third-party warehousing company (i) to move products 'across the street' to another warehouse so that the auditors would not see them, and (ii) to exclude certain products from the physical inventory count even though the inventory was actually still sitting in the warehouse." *Id.* ¶ 30.

For example, the SEC cites a January 5, 2017 email wherein Felton wrote, "[a]ccording to Bill [Aisenberg] there are three orders sitting at [the third-party warehousing company] that have to get moved today without exception. . . . If they don't get picked up they have to move across the street.  They cannot be in our warehouse space when the auditors arrive!!!!" *Id.* ¶ 31 (ellipses in original).   The SEC asserts that Ironclad in fact recognized revenue for these three orders in the prior quarter.  *Id.*  "Similarly, in a March 31, 2017 email discussing a large order that the customer was not planning to pick up until the week *after* quarter end, Felton instructed the warehouse personnel to 'move it across the street or just across the aisle.'" *Id.* ¶ 32.  Finally, the SEC asserts that Felton directed that certain products

"be intentionally excluded from Ironclad's inventory count."  *Id.* ¶ 33.  "For example, in a series of emails on December 30, 2016 – one day prior to the end of the first quarter of 2017 – Felton's solution for untimely shipments for one large order was simply to ignore that order for purposes of Ironclad's inventory."  *Id.*  The result, according to the SEC, was to conceal Felton's conduct of prematurely closing orders so that Ironclad could continue to improperly recognize revenue.

    3.  <u>Modifying Customer Documents to Make Exchanges Appear as New Sales</u>

      The SEC also maintains that Felton altered customer documents so as to improperly transform revenue-neutral exchanges into new sales.  Specifically, in December 2016, Customer D, an Ironclad customer, agreed to exchange $100,000 of old gloves with new models.  *Id.* ¶ 35.  On December 29, 2016, Customer D sent an email "with the subject line 'Return/Exchange' attaching '2 spreadsheets with the gloves to be returned and exchanged.'"  *Id.* ¶ 36.  One of the spreadsheets was labeled "EXCHANGE" and the other "GLOVES TO RETURN."  *Id.*  The SEC alleges that, "[a]t Cordes's direction, . . . Felton altered the spreadsheets to conceal the fact that these transactions were exchanges.  First, Felton deleted the word 'EXCHANGE' from the first spreadsheet, so that the document would be processed as a new order.  Then he separately modified the 'GLOVES TO RETURN' spreadsheet to say 'GLOVES TO RETURN Q1 2017.'"  *Id.* ¶ 37.  Felton then allegedly forwarded the documents for processing as a new order for which Ironclad recognized $101,000 in

revenue.  *Id.* ¶ 38.

### 4.  Materially Misleading Financial Statements

The SEC maintains that, as a result of Ironclad's fraudulent scheme, "each financial statement filed by Ironclad on Forms 10-K, 10-Q, and 8-K during the Relevant Period contained fraudulently inflated sales and revenue numbers that were materially misleading to investors and potential investors."  *Id.* ¶ 39.  As a result of improper revenue recognition, "the financial statements for these periods did not contain accurate figures for the number of sales and the amount of revenue that Ironclad made during these periods."  *Id.*

### B.  Procedural History

The SEC filed its Original Complaint on April 8, 2020.  Cordes and Aisenberg consented to judgment against them (docket entries 6, 7, 8, and 9), leaving Felton as the sole defendant.  On June 15, 2020, Felton filed a motion to dismiss the Original Complaint (docket entry 11).  On December 2, 2020, the court granted that motion to dismiss without prejudice but granted the SEC leave to amend (docket entry 23). The SEC filed its Amended Complaint on January 7, 2021.  Felton filed the instant motion to dismiss on February 5, 2021.  The SEC filed a response on February 26, 2021.  Plaintiff's Response in Opposition to Defendant Thomas J. Felton's Motion to Dismiss First Amended Complaint and Brief in Support ("Response") (docket entry 28).  Felton replied on March 12, 2021.  Defendant Thomas J. Felton's Reply in

Support of Motion to Dismiss First Amended Complaint ("Reply") (docket entry

29).  Accordingly, Felton's motion to dismiss is ripe for decision.

## II.  ANALYSIS

### A.  Legal Standards

#### 1.  Standard for Dismissal Under Rule 12(b)(6)

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead

'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina*

*Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic*

*Corporation v. Twombly*, 550 U.S. 544, 570 (2007)), *cert. denied*, 552 U.S. 1182

(2008.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

need detailed factual allegations, a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S.at 555

(citations, quotation marks, and brackets omitted).  "Factual allegations must be

enough to raise a right to relief above the speculative level, on the assumption that all

the allegations in the complaint are true (even if doubtful in fact)."  *In re Katrina*

*Canal*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555) (internal quotation

marks omitted).  "The court accepts all well-pleaded facts as true, viewing them in

the light most favorable to the plaintiff."  *Id*. (quoting *Martin K. Eby Construction*

*Company, Inc. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004))

(internal quotation marks omitted).

The Supreme Court has prescribed a "two-pronged approach" to determine whether a complaint fails to state a claim under Rule 12(b)(6).  See *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  The court must "begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 679.  The court should then assume the veracity of any well-pleaded allegations and "determine whether they plausibly give rise to an entitlement of relief." *Id*.  The plausibility principle does not convert the Rule 8(a)(2) notice pleading to a "probability requirement," but "a sheer possibility that a defendant has acted unlawfully" will not defeat a motion to dismiss.  *Id*. at 678.  The plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (alteration in original) (quoting FED. R. CIV. P. 8(a)(2)).  The court, drawing on its judicial experience and common sense, must undertake the "context-specific task" of determining whether the plaintiff's allegations "nudge" its claims against the defendant "across the line from conceivable to plausible."  See *id*. at 679, 683.

## 2.  Rule 9(b) Standard

A complaint need only recite a short and plain statement of the claim showing that the pleader is entitled to relief.  FED. R. CIV. P. 8(a)(2).  When, however, defendants are charged with fraudulent activity, the plaintiff must state with particularity the circumstances constituting fraud.[3]  FED. R. CIV. P. 9(b).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The Fifth Circuit interprets Rule 9(b) strictly, requiring the plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir.), *cert. denied*, 522 U.S. 966 (1997); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001); see also *Benchmark Electronics, Inc. v. J.M. Huber Corporation*, 343 F.3d 719, 724 (5th Cir. 2003) (stating that Rule 9(b) requires the plaintiff to lay out "the who, what, when, where, and how" of the alleged fraud).  If the facts pleaded in the complaint are within the opposing party's knowledge, fraud pleadings may be based on information and belief.  See *Tuchman v. DSC*

---

[3]     As the Fifth Circuit has noted, the purpose of the heightened pleading standard of Rule 9(b) is to provide defendants with fair notice of the plaintiff's claims, protect defendants from harm to their reputation and goodwill, reduce the number of strike suits, and prevent a plaintiff from filing baseless claims in an attempt to discover unknown wrongs.  *Tuchman v. DSC Communications Corporation*, 14 F.3d 1061, 1067 (5th Cir. 1994).

*Communications Corporation*, 14 F.3d 1061, 1068 (5th Cir. 1994).

Rule 9(b) permits a plaintiff to allege generally the defendant's intent to commit fraud. FED. R. CIV. P. 9(b). ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). A mere allegation that the defendant had the requisite intent, however, will not satisfy Rule 9(b). *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994); *Tuchman*, 14 F.3d at 1068. To adequately plead fraudulent intent, the plaintiff must set forth specific facts that support an inference of fraud. *Tuchman*, 14 F.3d at 1068. The factual background adequate for an inference of fraudulent intent can be satisfied by alleging facts that show the defendant's motive.

In the event that the plaintiff fails to plead facts with sufficient particularity under Rule 9(b), dismissal of the action with prejudice is not automatic nor typically warranted. 6 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1300 (2d ed. 1990). Rather, courts usually provide an opportunity to cure the pleading "unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so." *Hart v. Bayer Corporation*, 199 F.3d 239, 247 n.6 (5th Cir. 2000); see also *Cates v. International Telephone and Telegraph Corporation*, 756 F.2d 1161, 1180 (5th Cir. 1985) ("[S]uch deficiencies do not normally justify dismissal of the suit on the merits and without leave to amend, at least not in the absence of special circumstances.").

Rather, Federal Rule of Civil Procedure 15 allows trial courts to "freely give leave [to amend] when justice so requires."  FED. R. CIV. P. 15(a)(2).

## B.  Application

In his motion to dismiss, Felton argues that the Amended Complaint is deficient in several regards: (1) the SEC misrepresented several pieces of evidence that were incorporated into its Amended Complaint; (2) the SEC did not properly plead scienter, materiality, or causation under Section 10(b) and Section 17(a); (3) the Amended Complaint did not plead certain facts with particularity under Rule 9(b); and (4) the SEC failed to plead facts sufficient to support its aiding and abetting claims.  The court addresses each argument in turn.

### 1.  Misrepresentation of Evidence

Felton first argues that the SEC "mischaracterize[d] cited testimony and evidence throughout" the Amended Complaint.  Motion to Dismiss at 5.  Felton's qualms with the SEC's interpretation of evidence spans Felton's own testimony, several emails, and Felton's alleged alteration of customer documents.  *Id.* at 5-12.  Citing *Bosarge v. Mississippi Bureau of Narcotics*, 796 F.3d 435, 440 (5th Cir. 2015), Felton asks the court to "compare the SEC's allegations in the [Amended Complaint] to the SEC testimony and evidence cited in the [Amended Complaint] and disregard the allegations that are inconsistent with that cited testimony and evidence."  Motion to Dismiss at 4-5.  Felton goes so far as to attach a 91-page Appendix to his motion

to dismiss for comparison.  The SEC, also citing *Bosarge*, counters that the court should "disregard Felton's competing interpretation of the evidence" under Rule 8(a) and Rule 9(b) pleading principles.  Response at 8-10.

The SEC is correct that the court need not consider Felton's interpretation of the evidence or review the Amended Complaint for fidelity to a record that has not yet been established.  Far from supporting Felton's argument, the Fifth Circuit's decision in *Bosarge* requires the opposite result.  In *Bosarge*, the Fifth Circuit considered whether law enforcement affidavits attached to the defendant's motion to dismiss and which were "relie[d] [on] substantially" by the complaint should be considered as part of the pleadings.  796 F.3d at 440.  The Fifth Circuit began by noting the general rule that the plaintiff's allegations are entitled to "the presumption of truth" at the motion to dismiss stage.  *Id.* at 441.  On the other hand, the court also recognized a special subset of cases which have held that certain documents such as contracts and medical records "trump contradictory allegations in the complaint." *Id.* at 440-41.  With regard to the law enforcement affidavits at issue there, the Fifth Circuit in *Bosarge* appears to have split the difference between the general and special rules: "we therefore do not accept as true all allegations in the agents' affidavits, but rather consider these affidavits to better understand Bosarge's amended complaint, *while ensuring that Bosarge does not misrepresent the agents' statements*."  *Id.* at 441 (emphasis added).  The court cautioned, however, that "while the affidavits may be

considered as an aid to evaluating the pleadings, they should not control to the extent that they conflict with Bosarge's allegations." *Id.* at 440.

Felton asks the court to follow this middle-ground approach by "compa[ring] the SEC's allegations in the [Amended Complaint] to the SEC testimony and evidence cited in the [Amended Complaint] and disregard the allegations that are inconsistent with that cited testimony and evidence." Motion to Dismiss at 5. The court declines Felton's invitation for two reasons. First, the SEC did not rely on any particular piece of evidence so substantially or systematically so as to warrant incorporation as part of the pleadings. In *Bosarge*, the plaintiff quoted extensively and "relie[d] substantially" on the affidavits. *Id.* Here, however, the SEC relies on several different pieces of evidence in constructing its Amended Complaint, including Felton's testimony, emails, Ironclad's records, and receipt agreements. Unlike the law enforcement affidavits in *Bosarge*, the SEC does not base its complaint on any one source so throughly so as to justify incorporation under Rule 12(d), thereby potentially bringing such evidence within the limited protections outlined in *Bosarge*. Second, even if the SEC did so systematically and substantially rely on Felton's testimony or other evidence so as to justify some degree of "consider[ation]," *Bosarge*, 796 F.3d at 441, such consideration would not require the court to "disregard" the SEC's claims, as Felton requests. Motion to Dismiss at 5. The Fifth Circuit in *Bosarge* foreclosed such a reading. *Bosarge*, 796 F.3d at 440 ("However, while the

affidavits may be considered as an aid to evaluating the pleadings, they *should not control to the extent that they conflict with Bosarge's allegations*.") (emphasis added).  In other words, the court does not read *Bosarge* as fundamentally altering the relationship between Rule 12(b)(6) and Rule 56.  Accordingly, Felton's reliance on *Bosarge* is misplaced and the court need not consider the evidence attached to Felton's motion to dismiss or Felton's interpretation of such evidence.  The court need not reach the SEC's alternative argument that Felton's interpretation of the facts is "[s]imply [w]rong."  Response at 10.

 2.  <u>Direct Violations of Section 10(b) (Count I)  and Section 17(a) (Count III)</u>

To prevail on a § 10(b) claim, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (quotations and citation omitted).  With limited caveats noted below, the elements of § 10(b) and § 17(a) liability are "substantially the same." *Securities and Exchange Commission v. Spence & Green Chemical Company*, 612 F.2d 896, 903 (5th Cir. 1980), *cert. denied*, 499 U.S. 1082 (1981).  Accordingly, the court considers direct violations of each statute together.  Felton challenges the first three elements.  The court begins with scienter before moving on to the first and third elements.

a.  <u>Failure to Properly Allege Scienter</u>

With regard to scienter, Felton argues that the Amended Complaint (1) fails to properly allege a motive; (2) fails to allege that Felton possessed the "specialized accounting knowledge" necessary to form the requisite intent; and (3) provides only conclusory allegations of Felton's knowledge or, if not conclusory, fails to rise to the level of severe recklessness.  Motion to Dismiss at 13-17.

In alleging a direct violation of securities laws – including Section 10(b) of the Exchange Act and Section 17(a)(1) of the Securities Act – a plaintiff must demonstrate that the plaintiff acted with scienter.  *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996).  Unlike typical allegations of fraud subject to Rule 9(b), "the second sentence of Rule 9(b) relaxes the particularity requirement for conditions of the mind, such as scienter: 'Malice, intent, knowledge, and other conditions of mind of a person may be averred generally.'" *Tuchman*, 14 F.3d at 1068 (quoting FED. R. CIV. P. 9(b)).  However, "simple allegations that defendants possess fraudulent intent will not satisfy Rule 9(b)," and the plaintiff "must set forth *specific facts* supporting an inference of fraud." *Melder*, 27 F.3d at 1102 (emphasis in original).  Importantly, a plaintiff may demonstrate fraudulent intent in two ways: "[a]lleged facts are sufficient to support such an inference if they *either* (1) show a defendant's motive to commit securities fraud or (2) identify circumstances that indicate conscious behavior on the part of the defendant." *Herrmann Holdings Limited*

*v. Lucent Technologies Inc.*, 302 F.3d 552, 565 (5th Cir. 2002) (emphasis added) (quotations and citation omitted).  The standard for "identifying circumstances that indicate conscious behavior," however, is "more stringent" than for establishing a motive.  *Tuchman*, 14 F.3d at 1068-69.  Specifically, the standard for fraudulent intent through circumstantial evidence indicating conscious behavior is "severe recklessness."  The Fifth Circuit has defined severe recklessness as conduct involving

> highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Nathensen v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001).

### (1)  Failure to Allege a Motive

Drawing on language in the court's opinion dismissing the Original Complaint, Felton faults the Amended Complaint with failure "to allege any facts that suggest why . . . Felton would have had any motive or incentive to violate the law or that he made any money based on his alleged actions" and that, "[d]espite over two years of investigation, . . . the SEC has failed to identify" a motive for Felton to engage in fraud.  Motion to Dismiss at 13 (quotations and citation omitted).

Although the SEC did not allege a motive, controlling precedent makes clear that a plaintiff need not make such a showing.  See, e.g., *Hermann Holdings Limited*, 302 F.3d at 565*; Tellabs, Inc. v. Makor Issuers & Rights, Limited*, 551 U.S. 308, 325

(2007) ("While it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference, . . . the absence of a motive allegation is not fatal.").  And contrary to Felton's reading, nothing in this court's previous opinion suggested otherwise.  The relevant portion of the court's previous opinion – bolded and italicized in Felton's motion to dismiss – provided that, "[t]o adequately plead fraudulent intent, the plaintiff must set forth specific facts that support an inference of fraud.  The factual background adequate for an inference of fraudulent intent can be satisfied by alleging facts that show the defendant's motive."  (docket entry 23 at 11).  This portion of the opinion merely echoed the holding in *Herrmann Holdings*: a plaintiff *can*, but is not *required*, to demonstrate fraudulent intent through allegation of a motive.  Felton improperly converted this permissive, sufficient condition to a necessary one.[4]  Accordingly, the Amended Complaint need not be dismissed for failure to allege a motive.[5]

----

[4]    Felton admitted in his Reply that the SEC was not required to demonstrate a motive.  *See* Reply at 6.

[5]    To the extent that the SEC alleged Felton's motive was "his substantial salary," Response at 15, this "motive" is insufficient under Rule 9(b).  The Fifth Circuit "has held that certain motives alleged, especially those universal to corporations and their officers, do not suffice to establish an inference of fraud under Rule 9(b)."  *Flaherty* & *Crumrine Preferred Income Fund, Inc. v. TXU Corporation*, 565 F.3d 200, 213 (5th Cir.), *cert. denied*, 558 U.S. 873 (2009).  A salary is quite clearly a motive common to all corporate officers and does not amount to the special circumstances required by Fifth Circuit precedent.

### (2)  Failure to Allege Specialized Knowledge of Accounting Principles

Felton next argues that the Amended Complaint "fails to meet the pleading threshold of Rule 8 when it attempts to impute implausibly specialized knowledge to . . . Felton" by failing to allege that Felton "was knowledgeable regarding GAAP or FASB Accounting Standards."  Motion to Dismiss at 14-15.  Citing *Securities and Exchange Commission v. Shanahan*, 646 F.3d 536, 543-48 (8th Cir. 2011), Felton appears to argue that Rule 9(b) requires a plaintiff to demonstrate that the defendant possesses "expert knowledge" such as "aware[ness] of the specific GAAP and FASB provisions dictating when revenue is recognized."  Motion to Dismiss at 15-16.

The SEC need not allege that Felton possessed "specialized knowledge" of accounting principles or was technically trained in accounting in order to satisfy Rule 9(b)'s scienter requirement.  Felton's reliance on *Shanahan* as support for this proposition is misplaced.  In *Shanahan*, the Eighth Circuit upheld a judgment as a matter of law in favor of a defendant charged with securities fraud.  646 F.3d at 543-48.  The Eighth Circuit held that the SEC failed to establish scienter because the defendant "relied on the [company's] finance and accounting departments, outside and general counsel, and the company's independent auditors to ensure that the stock option Plans were properly administered and that [the company's] proxy statements made appropriate and accurate disclosures."  *Id.* at 544.

Contrary to Felton's interpretation, the Eighth Circuit did not narrowly hold

that a plaintiff must demonstrate that the defendant possess "specialized accounting knowledge" in order to possess the requisite scienter under Rule 9(b), even given the "complex [accounting] issues" present there.  See *id.* at 546.  Nowhere does the *Shanahan* court say that the defendant in that case lacked the requisite scienter because he was not a trained accountant.  Indeed, such a holding would run against the grain of most cases finding the requisite scienter.  See, e.g., *Securities and Exchange Commission v. Shapiro*, 2007 WL 788335, at *8 (E.D. Tex. Mar. 14, 2007) (denying a motion to dismiss filed by a non-accountant despite the "voluminous and complex" accounting issues present in the case); *Securities and Exchange Commission v. Egan*, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014) ("Allegations that the accounting rules are straightforward and the company's accounting treatment was obviously wrong may create an inference of scienter.") (citations and quotation marks omitted).[6]  Although the *Shanahan* court noted the defendant's lack of "personal expertise" in the accounting practices at issue, the bulk of the Eighth Circuit's rationale concerned the defendant's reliance on the company's internal and external accountants and lawyers and the defendant's role as an outside director, rather than a corporate officer with

---

[6]     Of course, a defendant must have *some* basic understanding of accounting.  A defendant must at least recognize, for example, that closing orders has the effect of generating revenue.  The court discusses this minimal requirement more fully below in light of the severe recklessness standard.  Felton is only incorrect in his attempt to transform the necessity for this rudimentary understanding of accounting practices into a requirement of some type of formalized training in the field or specialized knowledge of particular accounting practices or principles.

day-to-day responsibilities overseeing accounting practices.  *Id.* at 544, 46.

Accordingly, it appears that the Eighth Circuit's central concern was the defendant's

*general* unfamiliarity with the accounting practices used at the business and his overall

distance from accounting activities.  The scope of Felton's involvement in Ironclad's

day-to-day activities and the degree of alleged control that Felton possessed over

when and how certain orders were closed easily distinguishes his role in the alleged

scheme in this regard.[7]

  For this same reason, Felton is also mistaken that the SEC is required to aver

that Felton specifically "knew that it was improper to delay processing a return."

Motion to Dismiss at 16.  "When analyzing a complaint for scienter, a court must

'assess all the allegations holistically,' not in isolation."  *Owens v. Jastrow*, 789 F.3d

529, 536 (5th Cir. 2015) (quoting *Tellabs*, 551 U.S. at 326).  "The inquiry is whether

all of the facts alleged, taken collectively, give rise to a . . . plausible inference of

scienter, not whether any individual allegation, scrutinized in isolation, meets that

standard."  *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009).

---

[7]  The SEC is also correct to note the stark differences in the procedural postures of *Shanahan* and the instant case.  In particular, the district court decision at issue in *Shanahan* occurred after nearly nine days of trial, not on a motion to dismiss. 646 F.3d at 539.  The parties presented, and the court had the opportunity to hear, "serious debate among accounting professionals as to the appropriate manner in which to price employee stock options, and academic debate surrounding the propriety of retrospectively priced options."  *Id.* at 547.  Accordingly, the weight of *Shanahan*'s precedential value at this juncture is significantly diminished.

Although the SEC did not specifically allege that Felton had knowledge of the specific accounting practices regarding the delay of returns, Felton's alleged conduct in this regard fits well within the overall scheme.

### (3)   Conclusory or Insufficient Allegations of Scienter

Felton argues that the SEC relies on conclusory allegations of Felton's intent. Felton points to "boilerplate statement[s]" at the beginning of each of the eight counts enumerated by the SEC.  *See* Motion to Dismiss at 13; Amended Complaint ¶¶ 40, 42, 44, 46, 48, 50, 52, 56, 59, 62, 66, 67.  Felton also argues that, to the extent that the allegations are not conclusory, the Amended Complaint does not satisfy the "severe recklessness" standard. Contrary to Felton's assertions, the SEC's allegations are not conclusory and amount to a showing of severe recklessness.

To state the obvious, "rote conclusory allegations that the defendants 'knowingly did this' or 'recklessly did that' fail to meet the heightened pleading requirements of Rule 9(b)." *Lovelace*, 78 F.3d at 1019.  Circumstantial evidence may give rise to an inference of scienter, but it must satisfy a "more stringent" standard. *Tuchman*, 14 F.3d at 1069.  In *Tuchman*, for example, the plaintiffs cited "several allegedly contradictory statements made by the defendants" concerning the company's "responsibility for the telephone network outages" and "the adequacy of [the company's] testing of the software involved in those outages." *Id.* at 1069.  The Fifth Circuit rejected this circumstantial evidence of fraudulent intent because the

plaintiffs "conspicuously failed to allege any facts that show that [the defendant's] statements were belied by his actual knowledge of contradictory facts." *Id.* The allegations made by the SEC in this case are a far cry from the bare-bones, uninformative allegations in *Tuchman*.

The SEC alleges at least two categories of non-conclusory circumstantial facts that, taken together, support an inference of fraudulent intent.[8] First, the Amended Complaint contains several statements by Felton demonstrating his understanding of basic accounting principles (*i.e.*, that he understood the revenue-generating effect of closing orders). For example, the SEC avers that "Felton understood that a sales transaction must be complete 'in order to be able to count that sale as part of the period.'" Response at 12 (citing Amended Complaint ¶ 23). Additionally, Felton "understood that 'in order for a sales [sic] to be recognized in a period, it had to have been shipped or turned over to a freight carrier.'" Amended Complaint ¶ 23. Finally, the SEC points to Felton's alleged communications with subordinates, demonstrating his knowledge that closing orders is necessary for Ironclad to recognize revenue: "For example, in a March 31, 2017 email, [Felton] states that orders must be 'turn[ed]

---

[8]    Felton makes much of the fact that the SEC used boilerplate language at the beginning of each count. It is an unduly rigid formalism, however, to require the SEC to match with exactitude each enumerated count with specific allegations made in the body of the complaint. Rather, that complaint is to be viewed "holistically" for an inference of scienter. *Owens,* 789 F.3d at 536 (quoting *Tellabs,* 551 U.S. at 326).

over to [Ironclad's] forwarder and get delivery receipt to be able to count for' a quarter's sales."  Amended Complaint ¶ 24 (alterations in original).  The Amended Complaint also makes clear that "tracking and maintaining information regarding Ironclad's inventory, managing Ironclad's inventory, managing the shipment of orders . . . , and ensuring that sales transactions were completed" were all integral parts of Felton's job at Ironclad.  *Id.* ¶ 11.

Second, the SEC points to conduct by Felton that supposedly actualizes this understanding of basic accounting.  First, Felton is alleged to have repeatedly closed orders or otherwise acted on the final days of certain quarters.  See, e.g., *id.* ¶¶ 25-29.  Certain of these actions would make little sense unless Felton understood basic accounting practices.  For example, "on March 30, 2016 – two days before the end of the first quarter of 2016 – Felton directed a representative from Ironclad's third party warehouse company not to count returned inventory . . . until after the close of the quarter."  *Id.* ¶ 34.  Although there is nothing inherently noteworthy about a flurry of activity prior to the end of a fiscal quarter, such repeated actions provide important background information for the rest of the SEC's allegations.  Second and more importantly, Felton apparently felt the need to conceal certain actions from Ironclad's auditors.  The SEC alleges, for example, a January 5, 2017 email in which Felton directed the warehousing company to move orders immediately: "[a]ccording to Bill [Aisenberg] there are three orders sitting at [the warehousing company] that

have to get moved today without exception. . . . If they don't get picked up they have to move across the street.  They cannot be in our warehouse space when the auditors arrive!!!!"  Amended Complaint ¶ 31.  "Similarly, in a March 31, 2017 email discussing a large order that the customer was not planning to pick up until the week *after* quarter end, Felton instructed the warehouse personnel to 'move it across the street or just across the aisle.'"  *Id.* ¶ 32 (emphasis in original).  Again, this behavior would be difficult to explain absent (1) some knowledge of how revenue generation works at Ironclad, and (2) some degree of fraudulent intent, especially given the urgency apparent in Felton's communications.[9]  Accordingly, the SEC's use of Felton's own testimony and accompanying behavior is far from conclusory and, in fact, support an inference of some degree of fraudulent intent.

The court is also satisfied that the SEC has pleaded facts sufficient to support an inference that Felton's conduct was, at least, severely reckless.  As noted above, severe recklessness is limited to "highly unreasonable omissions or misrepresentations" involving "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers . . . which is either

---

[9]    This conclusion is bolstered by the requirement that the complaint provide facts sufficient for a mere inference, rather than a "strong inference" as under the Private Securities Litigation Reform Act of 1995.  Under the latter criterion, a litigant must demonstrate that the inference in favor of finding scienter is "at least as compelling as any opposing inference."  *Tellabs*, 551 U.S. at 324.  Under the test operative here, however, a reviewing court need not even "take into account plausible opposing inferences."  *Id.* at 323.

known to the defendant or is so obvious that the defendant must have been aware of it." *Nathensen*, 267 F.3d at 408.  The SEC's allegations meet this standard.  The SEC's use of Felton's testimony, taken as true, demonstrates that Felton understood that closing orders increased Ironclad's revenue and that orders generate revenue for the quarter in which they were closed.  It is significant also that Felton attempted, on at least two occasions, to hide certain allegedly premature orders from Ironclad's auditors.  It is difficult for the court to make sense of Felton's conduct in moving individual orders out of the third-party warehouse or to another aisle except on the inference that Felton understood that Ironclad impermissibly recognized revenue for those products.  The flurry of Felton's alleged conduct shortly before the end of several quarters gives additional context supporting an inference of fraud.  Nor is Felton's conduct explained as mindless, day-to-day activities.  In particular, Felton's alleged affirmative act in relabeling customer orders from "exchange" and "gloves to return" into a new order stands out.  Accordingly, the SEC's allegations satisfy Rule 9(b)'s scienter requirement and support an inference of fraudulent intent.

### b.  Failure to Plead Materiality

To "prevail on a claim for securities fraud under [Rule 10-b5] . . ., the plaintiff must prove, *inter alia*, 'materiality.'" *Greenhouse v. MCG Capital Corporation*, 392 F.3d 650, 655 (4th Cir. 2004).  A misstatement or omission is material if "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed

by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

At this stage, the court is satisfied that the Amended Complaint alleges materiality. As a result of alleged scheme, Ironclad improperly recognized $3.3 million in revenue between 2015 and 2017. Amended Complaint ¶ 21. This represented approximately 9% of Ironclad's gross revenue over that period. *Id.* Indeed, Ironclad's overstatements were so large that it filed a Form 8-K announcing that investors should not rely on its financial statements throughout the relevant period. *Id.* ¶ 16. *Securities and Exchange Commission v. RPM International, Inc.*, 282 F. Supp. 3d 1, 23 (D.D.C. 2017) (finding, in the context of a Form 10-Q, that "[c]ourts have held that the issuance of a restatement sufficiently pleads materiality because under GAAP, a restatement issues only when errors are material") (quotation and citation omitted).[10] Although the SEC rarely "state[d] the amount of money allegedly involved" in any specific transaction of which Felton was a part, Motion to Dismiss at 20, the Amended Complaint contains enough facts to conclude that Felton participated in sufficiently large and numerous transactions so as to satisfy

---

[10]   Felton is narrowly correct that Ironclad's July 6, 2017 Form 8-K is not a "restatement of its financial statements." Reply at 8. The Form 8-K nevertheless warned investors not to rely on Ironclad's reports throughout the Relevant Period, surely information material to investors.

materiality for purposes of the motion to dismiss.  For example, Felton allegedly (1) changed Customer D's exchange into a new order valued at $101,000, Amended Complaint ¶¶ 36-38; (2) "identified 14 separate orders totaling 29,624 gloves" that would not be shipped to customers but for which Ironclad recognized revenue, *id.* ¶ 28; and (3) "ordered a member of his team to prepare a delivery receipt for a large order totaling more than $276,000" for one quarter, despite the fact that the customer would not pick up the order until the following quarter.  *Id.* ¶ 29.[11] Although the precise dollar amount is unsettled, the number is potentially large enough to alter the "total mix of information" available to a reasonable investor. *Basic, Inc.*, 485 U.S. at 231-32.  Accordingly, the Amended Complaint sufficiently alleges materiality.[12]

c.  <u>"In the Offer or Sale" or "In Connection With the Purchase or Sale" of a Security</u>

Under Rule 10(b)-5, a plaintiff must demonstrate that the fraud occurred "in connection with" the purchase or sale of securities.  17 C.F.R. § 240.10b-5.

---

[11]     Contrary to Felton's view, the court does not necessarily saddle Felton with the total amount of Ironclad's inflated revenue.  *See* Reply at 8 ("[T]he SEC again takes the position that materiality is satisfied because *in the aggregate* . . . Felton's alleged actions contributed to a $3.3 million overstatement of revenue over the [Relevant Period].") (emphasis in original).  Rather, the Amended Complaint alleged specific transactions which are representative of Felton's involvement in the scheme.

[12]     Additionally, "materiality is a mixed question of law and fact" that "is usually left for the jury."  *United States v. Peterson*, 101 F.3d 375, 380 (5th Cir. 1996), *cert. denied*, 520 U.S. 1161 (1997).

Similarly, a claim brought under Section 17(a) requires a plaintiff to show that the fraud occurred "in the offer or sale" of securities.  15 U.S.C. § 77q.  The phrase "in the offer or sale" is "expansive enough to encompass the entire selling process." *United States v. Naftalin*, 441 U.S. 768, 773-74 (1979).  This includes fraud on more than just "investors," requiring only that the fraud occur "in" an offer or sale.  *Id.* at 772.  The Supreme Court has adopted a largely functional approach, explaining that federal securities statutes "should be construed not technically and restrictively, but flexibly to effectuate [their] remedial purposes." *Securities and Exchange Commission v. Zandford*, 535 U.S. 813, 819 (2002) (quotations and citation omitted).

The SEC points to three activities tending to support its position: (1) during the Relevant Period, Ironclad issued stock to its employees upon their exercise of employee stock options, Amended Complaint ¶ 10; (2) Ironclad's stock was publicly traded on the OTCQB, *id.*; and (3) Ironclad publicly disseminated information through documents such as Forms 10-K and 10-Q on which investors might rely, *id.* ¶ 39.  Felton's central argument is that the exercise of stock options by employees does not always amount to an "offer," "purchase," or "sale" of securities.  Motion to Dismiss at 21-22.  Rather, "whether employee stock options involve an offer or sale of securities depends on the specifics of the arrangement – allegations that are completely absent from the SEC's [Amended Complaint] in this case." *Id.* at 22.  Felton appears to argue that there must be some "investment decision or a choice" in

the exercise of the stock option in order to satisfy this element.  *Id.*

The SEC pleaded facts sufficient to support that the alleged fraud occurred "in connection with" and "in the offer or sale" of securities.  First, even if the court agreed with Felton that certain stock-option agreements do not amount to an "offer," "purchase," or "sale" of securities because of the lack of some "investment decision or a choice," the SEC is entitled to all reasonable inferences that flow from its allegations.  Although the SEC did not provide details about the stock-option agreements, it is reasonable to infer that the employees who exercised their stock options had some "choice" in doing so.  Second, Felton's argument does not address the SEC's other allegations (*e.g.*, that Ironclad's stock was publicly traded and that Ironclad disseminated information that investors could rely on).[13]  Accordingly, the SEC has adequately pleaded that the fraud occurred "in connection with" or "in the offer or sale" of securities.

### 3.   Failure to Allege Facts With Particularity

#### a.   Footnote 3, Paragraphs 17, 18, 26

Felton argues that the assertions contained in footnote 3, paragraphs 17, 18,

---

[13]    Felton's alternative argument that the SEC failed to connect specific purchases or sales of securities with specific actions by Felton is premature.  It is true that "timing matters" in demonstrating some relationship between a defendant's action and the purchase or sale of securities.  Motion to Dismiss at 23.  At least at this stage, however, the SEC need not construct a time-line detailing the exact temporal relationship between Felton's actions and the purchase or sale of securities.

26, and 30, "and other paragraphs" are conclusory.  Motion to Dismiss at 17-18.

Under Rule 9(b), a plaintiff must state "the who, what, when, where, and how" of the

alleged fraud.  *Benchmark Electronics, Inc.*, 343 F.3d at 724.  However, the SEC need

not "state *all* the facts pertinent to the case" at this stage.  *Securities and Exchange*

*Commission v. Sharp Capital, Inc.*, 3:98-CV-2792-G, 1999 WL 242691 at *2 (N.D.

Tex. Apr. 16, 1999) (Fish, J.) (emphasis in original).

   The court begins with the observation that the Amended Complaint, viewed

holistically, quite clearly satisfies the Rule 9(b) particularity standard and cures the

deficiencies identified by the court in its opinion dismissing the Original Complaint.

First, the Amended Complaint provides far more specificity in determining when

Felton's actions took place.  The SEC cites no fewer than nine specific dates on which

Felton allegedly engaged in fraudulent activity or directed others to do so.  Amended

Complaint ¶¶ 23, 24, 27, 28, 29, 31, 32, 34, 36.  Second, the SEC clearly identifies

the types of conduct that Felton – as distinguished from Cordes and Aisenberg –

engaged in and how that conduct furthered the alleged scheme to improperly

recognize revenue.  Specifically, the Amended Complaint alleges that Felton (1)

prematurely closed orders or delayed return of certain products, *id.* ¶¶ 2, 25-29, 34;

(2) concealed evidence of his activities from Ironclad's auditors, *id.* ¶¶ 30-33; and (3)

mischaracterized customer exchanges as new sales, *id.* ¶¶ 37-38.  Crucially, the SEC

also provided the essential link between Felton's testimony – which demonstrated his

knowledge of basic accounting practices – and conduct in furthering the overall scheme.  Finally, the Amended Complaint clearly articulates the "where" and "how" of Felton's activities: not only did Felton allegedly direct his subordinates to take certain actions, but Felton also directly and personally participated in the scheme. Accordingly, viewed as a whole, the Amended Complaint satisfies the Rule 9(b) particularity requirement.

Given this baseline, it is unclear what the import of Felton's argument is.  No count relies exclusively or primarily on those particular allegations.[14]  Even if the court found that those allegations are conclusory, the result would not be a dismissal of any particular count, much less of the Amended Complaint as a whole.  Felton tacitly recognizes this, as he fails to explain the significance of his position. Accordingly, Felton's narrow argument that footnote 3 and paragraphs 17, 18, and 26 are conclusory fails.

### b.  Internal Controls

One area in which the Amended Complaint does fail to satisfy the applicable

---

[14]        Nor is the court convinced that these allegations are in fact conclusory. For instance, paragraph 18 of the Amended Complaint contains a chart outlining the 53 orders that the SEC alleges were improperly processed with an accompanying breakdown of the orders' gross value and percentage of Ironclad's quarterly revenue. There is nothing "conclusory" about the chart except that it summarizes the SEC's allegations.  Nor is it relevant at this stage that the SEC failed to provide specific allegations regarding each and every improperly closed order.  See *Sharp Capital, Inc.*, 1999 WL 242691 at * 2.  Similarly, paragraph 17 merely restates a portion of the auditor's resignation letter to the chairman of Ironclad's audit committee.

pleading standard is the SEC's claim that Felton circumvented or failed to implement internal controls.  15 U.S.C. § 78m(b)(5) provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2)."  There is some dispute between the parties as to whether the heightened pleading standard of Rule 9(b) applies to the implementation of internal controls.  As Felton correctly notes, however, the SEC does not identify a single internal control that "govern[ed] the handling of sales, inventory, exchanges, returns, recognition of revenue, etc." Motion to Dismiss at 24.  Accordingly, the court cannot assess whether Felton "knowingly circumvent[ed]" the internal control.  § 78m(b)(5).  Nor does the SEC allege that Felton had the power to or was responsible for implementing such internal controls.  Irrespective of whether the heightened pleading standard applies, therefore, the Amended Complaint fails to sufficiently allege facts supporting this claim. Accordingly, the motion to dismiss count eight is granted.

### 4.  Failure to Sufficiently Allege Aiding and Abetting

Section 20(e) of the Securities and Exchange Act of 1934 allows the SEC to bring actions against aiders and abettors of securities fraud.  15 U.S.C. § 78t(e) ("[A]ny person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same

extent as the person to whom such assistance is provided."); *Securities and Exchange Commission v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012), *cert. denied*, 570 U.S. 918 (2013).  "To prove [an aiding and abetting violation], the SEC must prove: (1) a primary violation of the securities laws; (2) that the aider and abettor had knowledge of this violation and of his or her role in furthering it; and (3) that the aider and abettor knowingly provided substantial assistance in the commission of the primary violation." *Securities and Exchange Commission v. Life Partners Holdings, Inc.*, 854 F.3d 765, 778 (5th Cir. 2017).  An aider and abettor need only have a "general awareness that one's role was part of an overall activity that is improper . . . ." *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94-95 (5th Cir. 1975) (quotations and citation omitted).  To satisfy the "substantial assistance" component of the test, the SEC must demonstrate that the defendant "in some sort associated himself with the venture, that he participated in it as something that he wished to bring about, and that he sought by his action to make it succeed." *Apuzzo*, 689 F.3d at 206 (alterations and quotation marks omitted).

Felton is charged with four counts of aiding and abetting various fraudulent activity: counts II (Section 10(b) violation), IV (Section 17(a)(1) and (3) violations)), V (Exchange Act Section 13(a) ("Reporting requirement")), and VI (Exchange Act Section 13(b)(2)(A) ("Books and Records requirement")). Importantly, the mental state required for a "primary violation" differs depending on

the alleged infraction.  Specifically, a primary violation of Section 10b-5 and Section

17(a) requires the SEC to demonstrate that an individual acted with scienter.  On the

other hand, primary violations of the Reporting requirement, and the Books and

Records requirement require no showing of knowledge or intent by the primary

violator.  See *Securities and Exchange Commission v. McNulty*, 137 F.3d 732, 740-41 (2d

Cir.) (no scienter requirement for § 13(a) or (b) violations), *cert. denied*, 525 U.S. 931

(1998); *McConville v. United States Securities and Exchange Commission*, 465 F.3d 780,

789 (7th Cir. 2006) (no scienter requirement for § 13(b) violations), *cert. denied*, 552

U.S. 811 (2007); *Securities and Exchange Commission v. Das*, 723 F.3d 943, 954 (8th

Cir. 2013) (same).[15]  It is therefore natural for the court to divide the aiding and

abetting counts by their respective requirements for scienter or not.

a. Section 10(b) and Section 17(a)

Counts II and IV of the Amended Complaint charge Felton with aiding and

abetting Cordes's and Aisenberg's violations of Section 10(b) and Section 17(a),

respectively.  Amended Complaint ¶¶ 45, 53.  To prevail on a § 10(b) claim, a

plaintiff must prove "(1) a material misrepresentation or omission by the defendant;

(2) scienter; (3) a connection between the misrepresentation or omission and the

purchase or sale of a security; (4) reliance upon the misrepresentation or omission;

---

[15]     Although the Fifth Circuit has not directly addressed the question of the
mental state required to demonstrate a § 13(a) or (b) violation, the court follows the
weight of circuit court precedent on the question.

(5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc.*, 563 U.S. at 37-38. As noted above, essentially the same showing is required under Section 17(a).

At this stage, the court is satisfied that the SEC has pleaded facts sufficient to demonstrate all three elements of an aiding and abetting charge. First, the Amended Complaint has pleaded a "primary violation" of Section 10(b) and Section 17(a). In particular, the allegations against Aisenberg aver both an action and the requisite scienter. In the January 5, 2017 email by Felton to the third-party warehousing company, Felton relayed instructions from Aisenberg to move certain orders to avoid scrutiny by Ironclad's auditor: "[a]ccording to Bill [Aisenberg] there are three orders sitting at [the third-party warehousing company] that have to get moved today without exception. . . . If they don't get picked up they have to move across the street. They cannot be in our warehouse space when the auditors arrive!!!!" Amended Complaint ¶ 31 (alterations in original). The Amended Complaint also alleges that Aisenberg – Ironclad's Chief Financial Officer – had the requisite knowledge of basic accounting practices to understand the nature of this instruction. For example, the SEC avers that Felton "testified that his understanding of [Ironclad's revenue recognition practices] came from his discussions about these policies with Aisenberg, Ironclad's former CFO and co-participant in the revenue recognition scheme." *Id.* ¶ 23. Cordes also played a role in the alleged scheme when Cordes "direct[ed]" Felton to alter Customer D's spreadsheets "to conceal the fact

that these transactions were exchanges." *Id.* ¶ 37.[16]  The violations by Cordes and Aiesenberg satisfy the materiality and "in connection with" elements for the same reasons stated in Parts II.B.2.b and II.B.2.c.  Accordingly, the SEC has pleaded a primary violation of Section 10(b) and Section 17(a).

Second, if the SEC's allegations are taken as true, Felton was almost certainly "general[ly] aware[]" of his role in "activity that is improper."  *Woodward*, 522 F.2d at 94.  Felton's alleged communications with Cordes and Aisenberg demonstrate Felton's general awareness that Cordes and Aisenberg were participants in the overall scheme.  Finally, as demonstrated extensively throughout Part II.B.2. above, Felton provided "substantial assistance" in furthering the scheme by, *inter alia*, prematurely recognizing revenue for closed orders, concealing improperly closed orders from Ironclad's auditors, and modifying customer documents.  Felton's actions often coincided with instructions from Cordes or Aisenberg.  Accordingly, Felton's motion to dismiss counts II and IV must be denied.

---

[16]     Although not dispositive, the court is aided in its conclusion that Cordes and Aisenberg committed primary violations of Section 10(b) and Section 17(a) by the fact that the court has already entered judgment against them for precisely those violations.  *See* Final Judgment as to Defendant Juffrey D. Cordes (docket entry 8) and Final Judgment as to Defendant William M. Aisenberg (docket entry 9).  A finding of scienter was therefore necessary in each.  Of course, the judgments do not spell out precisely which activities Cordes and Aisenberg participated in and, as a consequence, its is unclear whether the scienter necessary for those judgments is relevant to the specific conduct alleged in the Amended Complaint.  Nevertheless, the previous finding of scienter adds to the plausibility of the SEC's allegations.

b. <u>Books and Records and Reporting Requirement Violation</u>[17]

Section 13(a) of the Exchange Act "requires all issuers subject to the Act's registration requirements to submit periodic reports to the Commission containing such information as the Commission may direct through its rules," including, for example, Form 8-K and Form 10-K. *Securities and Exchange Commission v. Falstaff Brewing Corporation*, 629 F.2d 62, 70 (D.C. Cir.), *cert. denied*, 449 U.S. 1012 (1980). One such catch-all rule requires that reports contain all material information not otherwise required by specific rules "as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading." 17 C.F.R. § 240.12b-20. A reporting violation occurs if false and misleading reports are filed. *Falstaff Brewing Corporation*, 629 F.2d at 70-71.

The SEC has adequately alleged a reporting violation by Ironclad. Ironclad filed Forms 10-K, 10-Q, and 8-K between the fourth quarter of 2015 and the first quarter of 2017. Amended Complaint ¶¶ 39, 55. The SEC alleges that each of these reports "materially misrepresented Ironclad's revenue to investors and potential investors." Response at 24. Accordingly, the Amended Complaint alleges a primary violation of Section 13(a). For the reasons set forth throughout Part II.B.2 above,

---

[17]     As scienter is not an element of either the Books and Records or Reporting requirements, the Rule 9(b) heightened pleading standard does not apply to these claims.

Felton provided Ironclad substantial assistance in making such material misrepresentations by, for example, prematurely closing orders – thereby artificially inflating Ironclad's revenues – and did so with knowledge that Ironclad would file such reports.

Section 13(b)(2)(A) of the Exchange Act requires issuers of securities to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."  17 C.F.R. § 240.13b2-1 provides that "[n]o person shall directly or indirectly falsify or cause to be falsified, any book, record, or account . . . ."  The SEC alleges that "Ironclad's books, records, and accounts contained falsely inflated revenue calculations" as a result of Felton, Cordes's, and Aisenberg's actions.  Amended Complaint ¶ 60.  For the same reasons set forth above, the court concludes that Felton provided Ironclad substantial assistance in failing to keep accurate books and records.  Accordingly, Felton's motion to dismiss counts V and VI is denied.

## III.  CONCLUSION

For the reasons stated above, Felton's motion to dismiss is **GRANTED** in part and **DENIED** in part.  The court **GRANTS** Felton's motion to dismiss count VIII. The court **DENIES** Felton's motion to dismiss all other counts.

**SO ORDERED**.

June 10, 2021.

_A. Joe Fish_
_____
A. JOE FISH
Senior United States District Judge